Etta Dreier, Adm. of the Estate of Louis Dreier, deceased, Appellant, v. Thos. W. McDermott, W. E. Chapman & Son, a copartnership, W. E. Chapman and C. J. Chapman, Appellees.

**Negligence:** EVIDENCE: BURDEN OF PROOF. The burden of proof is upon the plaintiff not only to establish a charge of negligence made against the defendant, but also to show by a preponderance of the evidence that the plaintiff himself was free from negligence contributing to his injury.

**Negligence defined.** Primarily negligence is predicated upon a failure to discharge some private or public duty, and consists in the doing of some act, or the omission to do some act, which a reasonably prudent man would not do, or would not omit to do, under like circumstances.

**Negligence:** DETERMINATION OF ISSUE. Ordinarily negligence and contributory negligence are questions of fact for the jury, and sometimes even where the facts upon which the negligence is predicated are not in dispute it is for the jury to say whether the course of conduct charged and proven is in itself negligence; but usually where reasonably honest minds could reach but one conclusion from the proven facts, the question of either negligence or contributory negligence is for determination by the court.

**Same.** Where the negligence of both parties contributes to the injury complained of the courts will not listen to either.

**Contributory negligence:** VOLUNTARY EXPOSURE TO DANGER: EVIDENCE. Where a person knowingly places himself in a dangerous position which he might easily have avoided he assumes all risk incident thereto. In the instant case plaintiff was riding a nervous and difficult horse to handle when excited and frightened, of which he was fully aware, and he knew that she was afraid of automobiles and likely to become unmanageable on the approach of a machine; *Held,* that plaintiff was guilty of contributory negligence

as a matter of law in waiting for the approaching automobile to come directly opposite him without dismounting or signaling the driver of the machine to stop, and was thereby precluded from recovering for injuries caused by the frightened animal.

*Appeal from Pottawattamie District Court.*—HON. A. B. THORNELL, Judge.

WEDNESDAY, MAY 7, 1913.

ACTION to recover damages, resulting from injuries received by being thrown from a horse, which it is claimed became frightened at an automobile on the public highway. —*Affirmed.*

*John J. Hess* and *H. L. Robertson,* for appellant.

*John P. Organ* and *W. H. Killpack,* for appellees.

GAYNOR, J.—The plaintiff is the administratrix of the estate of one Louis Dreier, and as such brings this action to recover damages of the defendants, and predicates her right to recover on what she claims to be the negligence of the defendants.

The facts alleged in her petition upon which she predicates her right to recover are substantially these: That on or about the 12th day of September, 1910, the defendants Chapman & Son were in the business of running automobiles for hire. That the other defendant McDermott was in the employment of these defendants, and was charged with the duty of running or driving defendants' automobiles from place to place. That on said day the defendant McDermott was in charge of, and operating, an automobile for the other defendants, and while so doing negligently and carelessly drove one of defendant's cars with great force and violence into and against a horse on which Louis Dreier was then riding on the public highway,

knocking the horse down, breaking its leg, thereby throwing the said Louis Dreier from said horse to the ground, causing injuries from which he subsequently died. That said McDermott was at the time of the collision driving said automobile at a high and dangerous rate of speed without due regard to the use of said highway by others, and, while proceeding upon the highway at the point of the collision, turned the automobile to the left or wrong side of the road, and on the side on which Dreier then was, and further was guilty of negligence in that he did not use ordinary care to prevent the collision, and the injuries consequent thereupon. That he failed to exercise ordinary care, in that he did not stop when he saw, or should have seen, the horse on which Dreier was riding had become restive. The plaintiff further says that the said Louis Dreier was free from any negligence on his part contributing to his injury. The defendant for answer to the plaintiff's claim denies each and every allegation thereof.

Upon the issues thus tendered the cause was tried to a jury. At the conclusion of all the testimony, the defendants moved the court for an instruction to the jury to return a verdict for the defendants on the grounds: (1) That there was no evidence before the jury showing, or tending to show, any act of negligence on the part of the defendant such as charged by the plaintiff in her petition. (2) That the evidence before the court did not show that the said Louis Dreier was free from negligence on his part contributing to the injuries of which the plaintiff complains.

The court, upon the submission of the motion, overruled the motion on the first ground, and sustained it on the second ground, saying: "There is some question upon the whole record in my judgment as to whether negligence is shown on the part of the defendant McDermott, but upon that question I would let the case go to the jury, but on the other question raised by the motion, to wit, the negligence of the said Louis Dreier, I think the motion

of the defendant ought to be sustained." Upon that question the jury were directed to return a verdict for the defendant, and did return a verdict for the defendant, and upon the verdict so returned a judgment was entered against the plaintiff, and from this ruling and judgment the plaintiff appeals.

It must be borne in mind that in all cases of this kind, under the repeated holdings of this court, the burden of proof rests upon the plaintiff, not only to establish the negligence charged against the defendant, but also to show, by a preponderance of the evidence, that the party claimed to have been injured by such negligence was free from any negligence on his part contributing to the injury of which complaint is made, or to the conditions out of which the injuries arose.

*1. NEGLIGENCE: evidence: burden of proof.*

Negligence is predicated primarily upon a failure to discharge a duty, whether that duty be owing to the public generally or to the individual and is defined to be the doing of some act which a reasonably prudent and cautious man would not do under like circumstances, or the omission to do some act which a reasonably prudent and cautious man would not omit to do under like circumstances, and which under the law or by reason of peculiar relationships existing it was his duty to do, or his duty not to do.

*2. NEGLIGENCE DEFINED.*

It is true that the negligence of the defendant and the freedom from contributory negligence on the part of the person complaining is usually a question for the jury, and it has been held that, even where the facts upon which negligence is predicated are not in dispute, it is sometimes a question for the jury to say whether or not the course of conduct charged and proven is in itself negligence; for them to say, from the facts proven, whether or not, under the circumstances of the case, a reasonably prudent and cautious man

*3. NEGLIGENCE: determination of issue.*

would have done or would have omitted to do the things charged to have been done. But this is not a hard and fast rule, for it has been held that when reasonably honest minds, having before them all the facts, could, upon a question of negligence or freedom from contributory negligence, reach but one conclusion, it then becomes a question for the court, and then it becomes the duty of the court to instruct the jury definitely and distinctly as to what their duty is under the record so made.

Negligence charged against the defendant as a primary and moving cause of the injury is no different in its essential elements than is the negligence of the plaintiff which contributes to the injury complained

4. SAME.    of. No party can complain of the negligence of another where his own negligence is a concurring cause in producing injuries. Where the negligence of both parties contribute to the result, the courts will not hear the complaints of either. It is said that this rule is based upon two considerations: (1) That no one shall be permitted to take advantage of his own wrong. (2) Upon the supposed inability of a court of law to apportion the damages occurring to the respective faults of the parties.

So far as this case is concerned, upon the record here presented, we have but one question to consider, and that is: Did the evidence before the court at the time of the ruling on the motion present such a state of

5. CONTRIBUTORY NEGLIGENCE: voluntary exposure to danger: evidence.    facts, which, being conceded (and they must be conceded for the purpose of this case), that they showed such conduct on the part of the deceased, contributing to the condition out of which the injuries grew, that honest minds, dwelling upon the facts so presented could reach but one conclusion—a conclusion adverse to the plaintiff's claim that the deceased was free from any negligence contributing to his injury, or the conditions out of which, and as a consequence of which, the injury complained of arose and followed. To sustain

the ruling of the court, this question must be answered in the affirmative. Otherwise, it was a question for the jury.

The trial court was of the opinion that the evidence was insufficient to show that the deceased was free from negligence on his part contributing to the injury of which the plaintiff complained, and the court so held in full recognition of the rule hereinbefore stated. It becomes our duty, therefore, to examine the evidence upon which the court's ruling was predicated, and to ascertain therefrom whether or not it presented such a state of facts that honest minds could not differ as to the conclusion that should be reached.

It appears from the evidence in this case that the road on which the deceased and the defendant McDermott were traveling runs east and west; that the defendant McDermott was driving an automobile, proceeding westward on the road, and the deceased proceeding eastward on the same road; that at the point where they met there are banks on either side; that the roadway was about twenty-four feet wide; that the deceased was riding a very fine, high-bred mare, being three-quarters running stock, very quick of action, and difficult to handle and control when excited or frightened; that he had known this mare intimately for several years, had ridden her frequently and knew her peculiar characteristics, and the manner in which she conducted herself when frightened, knew that she was afraid of automobiles and traction engines; that he purchased her from one Dr. Wyland, who had owned her for about seven years; that he worked for Dr. Wyland, and had an opportunity of seeing and knowing this horse and her eccentricities and vagaries; that he purchased her from Dr. Wyland, and that at the time he purchased her he was told that she was afraid of automobiles and traction engines, and that he should look out for her at such times, or she would get him. It appears that this mare from her earliest years was inclined to be unmanageable. Even when a colt, she

was difficult to handle, and exceedingly difficult to control, and that her owner had much trouble in breaking her to do any sort of work.

One Carlson, testifying, said:

When she was a young mare, she would do anything except what I wanted. She would kick and buck and strike. She would rear up, and fall over other horses. We tried to work her on the plow and cultivator. She would rear and plunge in the air, and quite often get scared or mad. The first time we hooked her up, she kicked for several hours. She would kick and jump and strike the ground. She was very rapid in her movements. She would try to run. She was afraid of most everything on the road. The most scary and nervous horse I ever worked, and I have broken a great many horses. I traded her to Dr. Wyland, from whom the deceased purchased her.

Dr. Wyland testified:

. I never drove her single. Whenever we met an automobile on the road, she would give evidence of being frightened. She was very hard to handle. Far more than the ordinary horse. I could manage her, but I had to hold tight rein on her. She would always run if she got a loose rein. She was quick as lightning, and had racing blood in her. Louis Dreier had charge of her when he worked for me. He often went out with me. When we met automobiles, she would always act as if she were frightened, scared. Whenever I saw an automobile coming I always began to get ready for business. I knew there would be something doing unless she was tired out. If she was real tired, she wouldn't pay much attention; but if she was not tired, or was in an active condition, you could feel that she was going to do something. I had to be very careful when I approached an automobile to know that I had her in check. When I sold her to Dreier, I told him that she was afraid of automobiles and traction engines, and that 'if he didn't look out, she would get him.'

Witness Gorman testified:

I saw this mare once when Dreier was riding her. I

733 was using a road grader.

was using a road grader. The horse got scared before she reached the grader, whirled and tried to get away, and threw herself back. When the mare fell, Dreier fell with her. When she got up, or was in the act of getting up, he mounted the saddle, and she ran right into my horses. She went like a shot out of a gun. She was violent. I would call her a kind of an outlaw. She was very quick. I saw her one time coming down by the pump. An engine we used for pumping. He was riding her at the time. She went down into the ditch with him. She did not throw herself. If she had gone down in the ditch like she did in the road, she would have killed him. He didn't get off of her. The actions of the mare were quick, and the boy was quick. He was an awful good rider. The deceased and Klopping were the best riders that ever came to Neola.

Witness Ryan testified:

She was very scary and very quick and very fast. She was so quick and so fast that I have seen her go out from under the deceased two different times. I mean by going from under him that the horse would start and jump so quickly, and would go on and leave him on the ground behind her, and other times I have seen her move so quickly that he would go off clear back to the back part of the horse, and he would grab her neck to keep from going under her. I have seen that several times. I have seen her go along and jump over embankments on the side of the road. Louis Dreier was riding her at the time. She was a horse that you wouldn't know what to expect from. The time she jumped over the bank was when she met an automobile in the road. It was quite a ways off at the time.

He further testified:

I would call Louis Dreier a good rider, but a careless rider. I rode with Dr. Wyland once when he owned the horse. I have seen the horse run away. I have ridden the horse myself. I rode her once. I then had experience enough with her.

Witness Klopping testified:

'A day or two before the accident the deceased drove this mare with another horse by my automobile which was standing still. The mare got frightened when he attempted to pass the car. She plunged and went by on the gallop. He drove into my yard. When I came in, she shied again, but he held her. I told him not to drive too close. He replied that she wasn't half as scared as she let on to be, and said I should have seen her the other day. He says: 'I was going up a hill and met a car coming down. The mare waited in the road until the car got pretty close to me, and then she wheeled around and ran down the hill with me.' I asked him if he could not hold her, and he said, 'No.'

It appears that at the time of the accident the deceased, seeing the automobile approaching from afar, reined his horse on the south side of the road, facing the approaching car; that he gave no signal to the driver of the automobile that indicated, in the least, that he had any fear of his ability to manage and control this mare in the event she took fright; that no notice or warning was given by him to the driver that any danger attended him on account of its approach. He sat and waited for the automobile, and the horse gave no indication, so far as this record shows, of any disposition on its part to become frightened until the automobile had practically reached a point almost directly opposite the standing horse; that it then wheeled suddenly and started back; that a struggle then ensued between the boy and the mare for the mastery; that the boy succeeded in controlling her movements to such an extent that she wheeled again towards the automobile; that the automobile then was on the north side of the road, moving slowly; that, when the horse was turned, she reared on her hind feet and struck out with her forefeet; that there were in the back seat of the automobile at the time three young ladies; that the defendant McDermott, observing the wild and reckless character of the mare, as

indicated by her conduct, fearing that she would injure his passengers, wheeled suddenly to the left and drove the automobile into the south bank; that in the mix-up the boy was thrown from the mare and killed, his neck being broken; that the mare kicked and broke the wind shield in front of the automobile; that after McDermott had wheeled his car to the left and into the south bank, presumably in order to avoid the collision, the horse was still rearing and plunging a few feet from the automobile. Then instantly the horse came back to the rear of the car, and Dreier was still then on the horse, and it was rearing and plunging. The horse threw her head and struck Dreier in the face. He fell to the ground and dislocated his neck.

It is not apparent from the record clearly just when it was that the horse kicked the wind shield and broke the glass and the side lamp, but it does appear that these things happened in the mix-up, and that immediately thereafter the horse ran away, and was subsequently discovered with one of its hind legs broken and many scars and bruises on its body. The whole matter happened so quickly that it is difficult to say from the record just at what point, time, or place any of the conditions shown to exist after the injury actually occurred or were brought about.

There is much confusion among the witnesses, as to what happened at the point of injury. There is no doubt that the occupants of the automobile were at the time greatly frightened. A rearing, plunging, maddened horse, in close proximity to the occupants of such a vehicle, has not a tendency to quiet the nerves, or to give calm, cool, and dispassionate judgment as to the details of what is being done. But we have no concern with the testimony touching the conduct of the defendant, since that matter was disposed of by the trial court. Our concern is only with the conduct of the deceased, and to ascertain and determine from conceded facts whether or not he was guilty

of negligence contributing to the conditions existing there which resulted in his death.

Some testimony has been introduced tending to modify, but none to contradict, the force of the testimony hereinbefore set out. Evidence is only for the purpose of carrying to the mind of the trier the knowledge of the existence, or nonexistence of disuputed facts, and we are of the opinion that no one can read this whole record, and not feel convinced beyond a doubt, that the mare upon which plaintiff was riding at the time of his injury was wild, vicious, and unmanageable when frightened, and that she was easily frightened when approached by an automobile; that the deceased knew this fact when he saw the automobile approaching; that when he reined his horse by the side of the road, and saw the automobile approaching he smelt the smoke of battle from afar off; that he knew that a struggle must take place between him and his mare for the mastery. He waited for the struggle and the struggle came, and the consequences complained of followed; that from the knowledge he had of this mare, of her disposition, and what he might reasonably have anticipated concerning her conduct, common prudence would have suggested at least that he give warning to the driver of the car as he approached, and this, if not for his own safety, for the safety of the occupants. Common prudence would have suggested that he turn from the point of danger, or that he dismount until the automobile had passed. None of these things he did, or attempted to do. He was a good rider, nervy and full of courage. He thought that he could control the mare. He knew that in many of these contests he had been vanquished, but still his courage rose above the danger. The approach of danger has an exhilarating effect upon many, and they meet it in hopeful expectation of victory. They like the struggle and defeat only serves as an additional incentive to the struggle. This seemed to be characteristic of the deceased. Men have a right to assume positions of

danger. They have a right to struggle for the mastery. They have a right, so far as they themselves are concerned, to imprudently put themselves in positions of danger, but, when they do this, the consequences of their rashness must fall upon their own heads.

It has been repeatedly held that where one knowingly places himself in a place of danger which he might easily have avoided he assumes all the risks incident thereto. It has been held where one knowing that the horse he was riding or driving became frightened at the approach of trains, and he remained in the seat until the train approached and scared the horse, he was guilty of contributory negligence, on the ground that he did not exercise that care for his own safety under the circumstances which a reasonably prudent and cautious man would have exercised. In support of this, see *Cornell v. Detroit Electric Ry. Co.,* 82 Mich. 495 (46 N. W. 791). See, also, *Flagg v. C. D. & C. G. T. Ry. Co.,* 96 Mich. 30 (55 N. W. 444, 21 L. R. A. 835). In the last mentioned case it was said: "The plaintiff saw the danger, knew the colt was young, not accustomed to the place, and that there was a safe way out, and, instead of adopting such a course, she took a chance of holding the colt and let the train pass. This was a miscalculation on chances, and she must suffer the consequence." As bearing upon this proposition, see *Gorman v. Des Moines Brick Co.,* 99 Iowa, 257; *Sutton v. Des Moines Bakery Co.,* 135 Iowa, 390; *Erdman v. Deer River Co.,* 182 Fed. 42 (104 C. C. A. 482); *Kroger v. Cumberland Fruit Package Co.,* 145 Wis. 433 (130 N. W. 513, 35 L. R. A. (N.S.) 473); *Oates v. Met. St. Ry. Co.,* 168 Mo. 535 (68 S. W. 906, 58 L. R. A. 447).

On the whole record, we think the case ought to be affirmed, and it is—*Affirmed.*