REBECCA DAVIS, Administratrix, Appellant, v. WARREN KNIGHT, Appellee.

No. 47336.

(Reported in 35 N. W. 2d 23)

DECEMBER 14, 1948.

1340

White & Bruner, of Carroll, for appellant.

James L. Pauley, Jr., and Chas. E. Hird, both of Jefferson, for appellee.

BLISS, J.—The statute above noted provides that the operator of a motor vehicle shall not be liable for damages to any passenger or person riding in said vehicle as a guest or by invitation and not for hire unless the damage is caused by reckless operation of the vehicle.

It is admitted that decedent was the guest of the defendant-owner who was driving the car. For the plaintiff to obtain a judgment for damages it was necessary that she establish by adequate evidence that the reckless operation of the car by defendant was the proximate cause of the death of the intestate.

At the close of plaintiff's evidence the defendant moved for a directed verdict. This motion was renewed at the close of all the evidence. At that time the court stated that it would reserve ruling on the motion and decide the case on its merits. It filed written findings of fact and conclusions of law, all to the effect that the relief prayed for by plaintiff was denied because she had failed to establish that there was any reckless operation of the car by defendant as alleged. Judgment was rendered accordingly. Having decided the case on its merits, the court stated that it was not necessary to rule on defendant's motion to direct a verdict in his favor, made at the close of all evidence.

I. This case is not triable de novo. In accord with the uniform prior decisions of this court, Rule of Civil Procedure 334 provides that findings of fact by the court in jury-waived cases have the effect of a special verdict. If the findings are supported by substantial evidence and are justified as a matter

of law, the judgment entered thereon will not be disturbed on appeal. Artificial Ice Co. v. Reciprocal Exchange, 192 Iowa 1133, 1138, 1139, 184 N. W. 756; Iowa Mutual Liability Co. v. De La Hunt, 197 Iowa 227, 228, 196 N. W. 17; 5 C. J. S., Appeal & Error, section 1656, page 675 et seq.; Finkle v. Finkle, 239 Iowa 783, 786, 32 N. W. 2d 807, 808.

The question is not what would have been the finding of this court or its members on the evidence received by the trial court, but whether the findings and judgment of the latter have the required support as stated above. Eilers v. Frieling, 211 Iowa 841, 844, 234 N. W. 275; Calkins v. Alley, 190 Iowa 1180, 1183, 181 N. W. 427; Sprecher v. Ensminger, 167 Iowa 118, 122, 149 N. W. 97; Second National Bank v. Mielitz, 211 Iowa 218, 219, 222, 233 N. W. 108, 110, stating: "Whether the finding is in accordance with the weight of the evidence is not here subject to review."; Kellogg v. Rhodes, 231 Iowa 1340, 1346, 4 N. W. 2d 412, 416, where we said: "We are not permitted to review the evidence de novo and decide the case as we think proper."; Crouse v. Cadwell Trans. & Stor. Co., 226 Iowa 1083, 1087, 285 N. W. 623; In re Estate of Matthews, 234 Iowa 188, 192, 12 N. W. 2d 162; 5 C. J. S., Appeal & Error, section 1656(h), page 698, section 1656(i), pages 699, 720, 721; Ross v. McQuiston, 45 Iowa 145, 146, where the court said: "But we are not required to hold that the judgment of the court is in accord with the preponderance of the evidence, in order to support it."

■ II. Ordinarily, the issue of negligence or recklessness is for the determination of the jury. This is uniformly true where there is conflict in the evidence. Courts have sometimes stated that if the facts are not in dispute the issue is one of law for the court. There is such a statement in Siesseger v. Puth, 213 Iowa 164, 182, 239 N. W. 46, 54, where the court said: "If the facts are not in conflict, it is for the court to determine whether the defendant has been proven 'reckless' in his operation of the automobile." This statement was rightly challenged in the dissenting opinion of Justice WAGNER, in which Justices STEVENS and MORLING joined. (213 Iowa 188.)

■ The recognized rule is that even where the facts are not in dispute the negligent or reckless conduct of a party cannot

1342

be conclusively established by a state of facts from which different inferences may be fairly drawn, or upon which fair-minded persons may reasonably arrive at different conclusions. In Pierson v. Chicago & N. W. Ry. Co., 127 Iowa 13, 22, 102 N. W. 149, 152, the court said: "* * * we have held that, even where the facts are not in dispute, it should be left to the jury to say whether a course of conduct is negligent, if reasonable men may honestly differ as to the conclusion to be drawn from such undisputed facts." Both before and since that decision the principle there stated has appeared in the decisions of this court. See Milne v. Walker, 59 Iowa 186, 188, 13 N. W. 101; Whitsett v. Chicago, R. I. & P. R. Co., 67 Iowa 150, 159, 25 N. W. 104; Bach v. Iowa Cent. R. Co., 112 Iowa 241, 244, 83 N. W. 959; Tobey v. Burlington, C. R. & N. Ry. Co., 94 Iowa 256, 264, 62 N. W. 761, 33 L. R. A. 496; Barnhart v. Chicago, M. & St. P. Ry. Co., 97 Iowa 654, 655, 656, 66 N. W. 902; Payne v. Fraternal Accident Assn., 119 Iowa 342, 345, 93 N. W. 361; Balcom v. City of Independence, 178 Iowa 685, 687, 688, 160 N. W. 305, L. R. A. 1917C, 120; Dreier v. McDermott, 157 Iowa 726, 729, 141 N. W. 315, 50 L. R. A., N. S., 566; Murphy v. Iowa Electric Co., 206 Iowa 567, 572, 220 N. W. 360; Rosenberg v. Des Moines Ry. Co., 213 Iowa 152, 155, 156, 238 N. W. 703; Robertson v. Carlgren, 211 Iowa 963, 974, 234 N. W. 824; Home Ins. Co. v. Fidelity-Phenix Fire Ins. Co., 225 Iowa 36, 47, 48, 279 N. W. 425; Schwickerath v. Maas, 230 Iowa 329, 333, 297 N. W. 248; Lawson v. Fordyce, 234 Iowa 632, 636, 12 N. W. 2d 301.

■ III. In the determination of the question before us the evidence must be construed as a whole in the light most favorable to the judgment of the trial court. Smith v. City of Hamburg, 212 Iowa 1022, 1023, 237 N. W. 330; Tilden v. Zanias, 228 Iowa 708, 709, 292 N. W. 835; Kellogg v. Rhodes, supra, 231 Iowa 1340, 1341, 1343, 4 N. W. 2d 412; White v. Grovier, 237 Iowa 377, 380, 21 N. W. 2d 769, 164 A. L. R. 943; Frideres v. Lowden, 235 Iowa 640, 642, 17 N. W. 2d 396; Maland v. Tesdall, 232 Iowa 959, 965, 5 N. W. 2d 327; 3 Am. Jur., Appeal and Error, section 897, pages 461, 462; 3 Am. Jur., Appeal and Error, section 945; 5 C. J. S., Appeal and Error, section 1656(i), page 700.

IV. As stated in Wilkins v. Howell, 194 Iowa 654, 655, 656, 190 N. W. 1: "It is conceivable, of course, that evidence might be of such a conclusive character as to entitle the plaintiff to a favorable finding, as a matter of law." But we have also held that "in the absence of an admission by the opposite party, it is seldom that a party having the burden [of proof] establishes his claim as a matter of law." Kellogg v. Rhodes, supra, 231 Iowa 1340, 1342, 4 N. W. 2d 412, 413.

See also Low v. Ford Hopkins Co., 231 Iowa 251, 254, 1 N. W. 2d 95; White v. Grovier, supra, 237 Iowa 377, 380, 21 N. W. 2d 769, 164 A. L. R. 943; Frideres v. Lowden, supra, 235 Iowa 640, 642, 17 N. W. 2d 396; State v. Dunne, 234 Iowa 1185, 1190, 15 N. W. 2d 296; Maland v. Tesdall, supra, 232 Iowa 959, 962, 5 N. W. 2d 327.

V. For one to violate section 321.494, Code, 1946, commonly referred to as the "guest statute", by the reckless operation of a motor vehicle, his conduct must be more than negligent. It must manifest no care or a heedless disregard for or indifference to the consequences or the rights or safety of those riding with him or of others. To be reckless in the operation of the vehicle his conduct need not be willful or wanton or involve moral turpitude. Nor does it include inadvertence, momentary thoughtlessness, error in judgment, mere carelessness or negligence. But it does include the operation of the vehicle in heedless disregard for or indifference to dangerous conditions, hazards, or perils, known to him or which in the exercise of reasonable care should have been known to him, without care for the rights or safety of others. This in substance and in general is the interpretation of said statute as held by this court in Siesseger v. Puth, 213 Iowa 164 et seq., 239 N. W. 46, and thereafter followed in numerous decisions, a few of which are Hart v. Hinkley, 215 Iowa 915, 917–919, 247 N. W. 258; Siesseger v. Puth, 216 Iowa 916, 917, 925, 926, 248 N. W. 352; White v. Center, 218 Iowa 1027, 254 N. W. 90; Roberts v. Koons, 230 Iowa 92, 296 N. W. 811; Harvey v. Clark, 232 Iowa 729–733, 6 N. W. 2d 144, 143 A. L. R. 1141; Popham v. Case, 223 Iowa 52, 271 N. W. 226; Olson v. Hodges, 236 Iowa 612, 621–623, 19 N. W. 2d 676.

The decisive and only issue for determination on this appeal

is whether there is sufficient evidence to sustain the court's findings and judgment. The answer must be found largely in the facts. They are free from material conflict. Earl Davis, the deceased, was an unmarried man twenty-five years old. He owned a large transport truck and trailer with which he did contract hauling largely between Denver and Chicago. His parents lived on a farm near Carroll, through which city he passed on his trips. He had been at his parents' home for about a week before January 18, 1947. For that evening the Davis family had planned a little farewell party for Dorothea Davis, sister of Earl, who had joined a group of girls who were going to travel about selling magazine subscriptions. Among those present at the party at the City Club in Carroll were Mr. and Mrs. Davis, the parents, Dorothea, her high school friend Evelyn Matthews, Earl, and the defendant, Warren Knight, a first cousin of the Davis children. Warren was about the same age as Earl. They had been in the service together. Were good friends and were together when their work permitted. Warren was then living in Jefferson, but came to Carroll once or twice a week. On this Saturday evening, January 18, the party met about 11 p.m. at the Club. They danced, visited, drank some beer, and left the Club about 1 a.m. Sunday, January 19, 1947, to go to the 30 Club on U. S. Highway 30 east of Carroll, to eat before going home. The litigants stipulated that none of the party were intoxicated. Earl Davis had a date with Evelyn for that Saturday evening. The defendant was driving a 1946 Chevrolet Business Coupé, which he had bought in July 1946. It was practically a new car. Earl and Evelyn were riding with defendant in his car to the 30 Club. They left the Burke Hotel shortly after 1 a.m. The defendant was driving. Evelyn sat in the middle and Earl at her right. They traveled southeast from the hotel, on Sixth Street, which coincides with Highway 30 until about 120 feet east of the east line of Maple Street —which opens into Sixth Street from the south. Sixth Street, which is paved up to that point, separates from Highway 30 there, and continues straight on in a southeasterly direction as a graveled street, while Highway 30 curves to the left at an angle of about 20 degrees and after a short distance straightens out and extends due east across Grant Road into the country.

Sixth Street is paved and curbed up to the east line of Maple Street. It is 31 feet wide up to that point, and from there on east, Highway 30 is paved to a width of 18 feet, but is not curbed. Maple Street is paved and abuts at a right angle to the south line of the Sixth Street paving, with which it forms a shallow gutter. At about the west line of Maple Street and at the south edge of Sixth Street there is an intake in the paving for the drainage of surface water. The intake is a 2 by 2 foot rectangle and is covered by a cast-iron grate which is sunk about a half an inch below the surface of the paving. The intake itself is apparently in a slight depression in the pavement, which depression is not clearly described. The engineer who made a plat of the highway over which the defendant's car passed just before the collision described the depression as not an abrupt one and due to the intake itself, which makes a slight depression, and the meeting of the Maple Street paving and the natural crown of the Sixth Street paving. He testified that "it would be pretty hard to say how far below the normal surface of the highway that the depression goes down. It would be just the natural crown of the highway. It gradually works out." It apparently was a slight shallow depression. There was no warning sign erected calling attention to it. It was about 25 feet west of the beginning of the curve in the highway. The curve itself was a gradual one and about 180 feet long. The standard curve sign stood on the north side of the highway about 185 feet from the east end of the curve. It was across the highway from an oil station. East of the curve sign and approximately along the north property line was a heavy stone and cement mortar wall, about 90 feet long, with nine pillars of the same material distributed through its length, the last or most easterly pillar being in the abutment to a culvert which crossed both the highway and Grant Road. The Knight car struck the first pillar west of this abutment pillar.

The parties were handicapped somewhat in the production of their evidence. Earl Davis, while conscious when taken to the hospital, died a few hours afterward. The defendant, Knight, was unconscious for the first few days in the hospital, and as a witness had no memory of anything which took place between the time the car left the Burke Hotel and the collision. He and

Evelyn Matthews were thrown from the car by the collision, and Davis was in the wrecked car. Evelyn was in the hospital for about three days. Sunday forenoon she talked with a highway patrolman and the county attorney and signed a statement written by the latter. On Monday she signed another statement prepared by Mr. Pauley, Jr., one of defendant's attorneys, after an interview with her. She testified that at the time she signed these statements she gave a true account of what took place just preceding the collision, but her memory left her afterwards and she had no definite memory of these matters at the trial. Both of these statements were received in evidence.

The distance from the Burke Hotel corner east to the beginning of the curve on Highway 30 is 1626 feet, or about four city blocks plus the intersecting streets. Evelyn's statement of Sunday, January 19, 1947, after reciting other matters about the party, and their getting into the car at the hotel, states:

"Warren Knight was driving the car, a coupé. I remember that as we left he picked up a tremendous amount of speed. I yelled, 'Don't drive so fast!' Earl yelled at him, too, about his speed but I don't remember his exact words. I remember going around a curve and then seeing a light wall or something in front of me. I remember Earl and I were yelling at Warren about speed when we were going around the curve and Warren said something back. I don't remember anything else until I came to and felt the grass. Then they brought me to the hospital."

Her statement of January 20, 1947, after stating that it was given voluntarily to Mr. Pauley after he had told her he was the attorney for the insurance company, recites:

"We got in Warren's car and drove east on Highway 30 from the Burke Hotel. Warren was driving and I was sitting in the middle and Earl Davis was sitting on the right side of the seat. As we proceeded east, I asked Warren not to drive so fast as it scared me. Earl also asked him to slow down. I do not know how fast we were going. After we had proceeded only a short distance the right rear wheel of his car hit something and the car started to swerve back and forth. I can

remember Warren saying, 'I can't control it.' The next thing I saw was some big white object in front of us. The next thing I knew I realized I was lying on the grass and then someone picked me up and put me in the back seat of a car."

A taxicab driver was first on the scene, and, with others who came, took the occupants of the car to the hospital. The most definite testimony was the deposition of K. J. Burgard of Denver, Colorado. He was thirty-nine years old, and was a truck driver for the Illinois, Colorado Express, making regular runs from Denver and Chicago, passing through Carroll. His work had taken him over this particular curve three times a week. He was an experienced driver, who knew much about motor vehicle accidents. He was a fair, frank, and intelligent witness. At about 1:30 on the morning of January 19, 1947, he approached this curve from the east with his truck at a speed of about 25 miles an hour. It was a dark, cold night, but there was no snow or ice on the ground and the pavement was dry. He testified that as he reached the east curve sign he saw a car approaching from the west "up in the street as far as you could possibly see. * * * It appeared to me as coming very fast. The car gave a slight bound at an uneven place in the road. The uneven place * * * is just before you enter the curve itself, at the end of the street at the point where the street and the highway divide. The car gave a bound from that position and it looked like he were going straight ahead off onto the continuation of the street which is a graveled street, and then the next thing he was shooting left across the highway in front of me, still traveling fast. He shot to the left sharply across the highway in front of me, and then sharply to the right. The car did not come too close to the front end of my truck. At that time the car passed through and I passed through very slowly myself. I thought I would look in the mirror and see if he was going to get straightened up—that is my left mirror—and he was out of sight. I made a glance to catch him on the highway behind me to my right. He went out of sight again. I glanced in my left mirror again. He was over on the highway again on the other side. He then went out of sight again in that mirror, making a third time crossing the highway

on the wrong side of the road—his left side of the road. I then observed the car stop very sudden, with a little bounce. It stopped against a stone wall across the shoulder of the road on the north side. I was sure someone had to be hurt in that car." He drove to the hotel and called the police.

Asked as to the rate of the car's speed, he replied:

"I would rather not voice an opinion relative to miles per hour but I will say the car was traveling very fast. At nighttime it is hard to judge relative to miles per hour, because all you have is a couple of headlights to look at, and there were no lights, no street lights."

Pressed further, the witness stated:

"Well, I was traveling 25 miles per hour. This car traveled three times the distance that I traveled approximately until the time of the impact from the time I first saw him, and I would rather let someone else make a decision as to whether the car was going how many miles per hour. The damage to the car, the distance traveled in my opinion is answer enough that the car was going at a very high rate of speed."

Plaintiff then offered to prove that if the witness were permitted to give his m.p.h. estimate, he would answer: "Not certain, he must have been doing approximately fifty-five miles per hour. That is my opinion. I am no judge of speed at that, you know, at night like that, not good enough judge to say he was going that fast. I believe he was." The offer was refused, but the court considered the estimate of the witness in making his findings.

The court also refused this offered answer of the witness: "From the distance the car traveled over my distance; at the speed he was doing, the car bounded, which ordinarily wouldn't happen at a normal rate of speed or slow, and the damage done to the car and the skid marks on the highway, and you don't get all those things driving normal."

This witness in company of Officer Flynn examined the "uneven place" in the pavement—the depression—and the skid marks of the tires, as the car swerved back and forth. On the first swerve to the left only the left tires made skid marks. On

the other zigzag swerves back and forth across the pavement the skid marks were made by the tires on both sides of the car. The skid marks indicated there was no flat or soft tire. Before the car swerved to the left the third and last time, it left a tire mark on the curb at the oil station on the south side of the highway. When the car struck the pillar "the back reared up in the air and settled down." The direct distance from the west end of the curve to the pillar was 480 feet.

The pillar which the car struck was solidly built of "nigger-heads" and cement mortar. Capping the pillar was a cement block 39 by 39 by 3.25 inches, and weighed approximately 500 pounds. It had been cemented to the stone pillar. It was knocked from its position to the ground by the collision.

As the defendant's car approached the truck the driver took precautions against a collision. He applied the brakes and reduced the speed of the truck to about five miles an hour and was ready to stop. Defendant's car was within the range of the truck's dimmed lights when it swerved to the left the first time. As the car then swerved to its right it came approximately within eight feet of the truck. The truck was about to enter the east end of the curve when defendant's car hit the pillar.

The evidence shows that defendant's car was quite thoroughly wrecked. So much so that his insurance carrier paid him the price of a new car. It sold the wrecked car for approximately $450 including the towage bills.

The chief findings of the court of which plaintiff complains are these (the first is a finding of fact, to wit) :

"The defendant was familiar with the road between the hotel and the place of the accident, having traveled it many times. It is not shown that he knew of the depression in the pavement and the intake installed therein.

"Conclusions of Law. * * * I have found that it was when the Knight car passed over the depression in the pavement that it bounded out of control.

"It was the act of the defendant in passing over the depression in the pavement at a high rate of speed which was the proximate cause of the accident and its tragic consequences.

"* * * the highway appeared to be smooth, there was little traffic, and the curve ahead was not a sharp curve.

"While the defendant had traveled this highway many times and was generally familiar with it, there is no reason to suppose that he was familiar with all the details of the road's construction, or knew of the depression in the pavement. His guests' protests were not directed to the danger existing by reason of the depression."

After stating that to be reckless one must have known, or should have known, of the dangerous conditions and perils which he disregards, the court said:

"The evidence does not show that the defendant had, or should have had, knowledge of the depression in the pavement. It follows that plaintiff must be and is, denied the relief sought in her petition."

The record establishes the defendant's general familiarity with this highway. He not only had been over it many times but before taking up his residence in Jefferson he had lived on Grant Road about a block and a half south of where the collision occurred. He was not asked whether he knew of the depression or of the intake. There was no testimony that he knew of them. Any finding that he had such knowledge would have to be based upon an inference from his general familiarity with the highway. The burden was upon the plaintiff to establish every element of her case. And in the absence of direct evidence that defendant had said knowledge, neither the trial court nor this court is required to infer a deduction that may or may not be correct. A finding that a certain fact does not exist or is not proved cannot be disturbed if there is no evidence in the record to show its existence. 5 C. J. S., Appeal and Error, 722, section 1656; Klaus v. Campbell-Ratcliff Land Co., 48 Okla. 648, 150 P. 676.

Second, the plaintiff complains that the court erred in finding that the car passed over the intake or that the depression was sufficiently deep to have caused the accident. It is her contention that the evidence shows the car was traveling in the center of the highway and that the intake and depression

were along the right, or south, side of the pavement. There is hardly a conflict in the evidence on this matter. Evelyn Matthews, in spite of her loss of memory, testified at considerable length. She testified:

"I remember we hadn't driven long before we hit something and I remember feeling it in the car. I remember a bump or a jog. I remember hitting something that made the car jog. * * * I wouldn't say for sure whether or not the bump was made before the car went into the curve but I think it was. * * * As to describing what happened when we came to this bump, I remember that when we hit this jog in the road, how a person will bounce up in the car. I can remember that and I remember very slightly going like this. * * * It was a very noticeable bump and it seems like it was before we went into the curve.

"Q. When you hit this bump do you remember whether you observed that the car continued straight ahead, or did the force from the bump throw it in one direction or the other? A. I don't think that it did. *We were on the right-hand side of the road.* Then it seemed that the car was swaying or kind of going back and forth. I wouldn't say for sure."

In her written statement to Mr. Pauley she stated that "the *right rear wheel* hit something and the car started to swerve." (Italics supplied.)

The driver of the truck saw the car hit the depression before reaching the curve, and bound upward and then it shot across to the left side of the pavement. He testified:

"The first thing I noticed about the car that particularly called my attention to it was when the car gave that bound. I readied myself for anything, like you do when you see something out of the ordinary. It gave the bound just before it entered into the curve. The highway has got a little raised or uneven spot at that point—the street has, rather, before you enter the pavement. I looked at that particular spot after the accident. Officer Flynn and I made an observation. You come off this uneven spot a few feet and then the curve starts. You are coming down a slight grade and then there is a little depression before you hit this place.

"Q. It was your observation that the Knight car hit this

place and then bounded as it did so? A. It bounded as it did so. Q. At that time, he was driving on the right-hand side of the pavement? A. He was approximately in the middle of the street and the car got nearer to the right-hand side of the pavement as it turned. The street continuation and the highway paving separate just before the curve. Q. He was on the right-hand portion of the concrete that constitutes Highway 30? A. That is right. Near the right-hand portion."

It is undisputed in the record that there is an intake for surface water with a metal grate covering depressed about a half inch below the surface of the pavement, which intake is also in a shallow depression in the pavement, along the south edge. The record discloses nothing else in or on the surface of the pavement west of the curve to cause a speeding car to jump or bounce up in the air off the pavement. Miss Matthews and Mr. Burgard, the driver of the truck, testify that just before the car reached the curve the car struck something which caused it to bound into the air and go out of the control of its driver. There is no evidence to the contrary. The logical and reasonable conclusion is that it was its striking the depression and the sloping rise from it which caused the bounding and uncontrollable movement of the car.

It is clear that there is substantial evidence sustaining every finding of fact and conclusion of law of the court.

■ Plaintiff contends that the court erred as a matter of law in holding that defendant was not reckless. This is a misconception of the record. The court denied defendant's motion for judgment at the close of plaintiff's evidence and refused to rule upon the same motion at the close of all the evidence. Had the court sustained either motion, it would have then ruled as a matter of law that defendant was not reckless. But instead, the court, sitting as a trier of the facts—as a jury—determined and decided the case on the facts and on its merits, by findings of facts, conclusions of law, and final judgment.

Of like procedure, in Moorhead State Bank v. DeCou, 200 Iowa 255, 256, 204 N. W. 221, a case tried to the court, in which defendant's motion, as it were, to direct a verdict at the close

of all the evidence, was sustained by the court because plaintiff's evidence was too uncertain and contradictory, Justice EVANS said:

"It will be seen that this was a finding of fact by the court, upon a consideration of all the evidence before it. There was no occasion for DeCou's motion, and it is apparent from the record that it served no function at that stage. It was a mere formality, in any event, and only a method of asking the court to render a decision."

Speaking only as obiter, had the trial court sustained defendant's motion to dismiss or for judgment, this court might have reviewed the case on its merits, but we would affirm if, upon the whole record, the court would have been justified in reaching the same result upon the full merits. See Coen & Conway v. Scott County Sav. Bk., 205 Iowa 483, 486, 487, 218 N. W. 325; Griffith v. Arnold & Rasmussen, 204 Iowa 1216, 1218, 1219, 216 N. W. 728.

Plaintiff in argument concedes that "the record presents no conflicting evidence upon any essential points. For all practical purposes, the situation in this respect is the same as though the case had been submitted on an agreed statement of fact." Her real complaint is that the court did not find for her on the evidence. Of a similar contention of the claimant in Wilkins v. Howell, 194 Iowa 654, 655, 656, 190 N. W. 1, Justice EVANS said:

"It will be noted from the foregoing statement that the appellant has little standing ground on which to base error of law. All the errors relied on by appellant for reversal are reducible to the one proposition that the court erred in failing to find for the plaintiff. Appellant's argument is directed largely to the proposition that there was sufficient competent evidence to sustain a finding in favor of the plaintiff on the facts. If this proposition were conceded, it would not avail the plaintiff. The weight of the evidence was for the trial judge to determine. He took the place of the jury in that regard. If the case had been submitted to a jury, and if an adverse verdict had resulted, it would not avail the plaintiff to find that the evidence was

sufficient to have sustained a favorable verdict. Her position upon this record is precisely the same as though the case had been submitted to a jury, and a verdict rendered against her."

What Justice EVANS said applies to this case. It is one on which reasonable men might honestly differ on the issue of reckless operation of a motor vehicle. Had the court found for plaintiff the judgment would have the support of substantial evidence entitling it to an affirmance. Likewise, since the court's judgment for defendant is supported by substantial evidence, it should be, and it is, affirmed.—Affirmed.

OLIVER, HALE, GARFIELD, WENNERSTRUM, MANTZ, MULRONEY, and HAYS, JJ., concur.

SMITH, C. J., concurs in result.