In re Estate of W. B. Puckett.

Robert Sullivan et al., Proponents-Appellees, v. Esther Ambrose, Contestant-Appellant.

No. 47474.

(Reported in 38 N. W. 2d 593)

August 5, 1949.

Roy E. Havens, of Logan, and Kimball, Peterson, Smith & Peterson, of Council Bluffs, for appellant.

Dan J. Buckley, of Harlan, and Thos. J. Buckley, of Dunlap, for appellees.

BLISS, J.—W. B. Puckett, age eighty-two, a long-time resident of Woodbine, Iowa, executed the proposed will on July 20, 1946. He died October 5, 1947. His wife died in November 1935. Three children were born to them. One died in infancy. One daughter, Mrs. Clyde Crowder, died at the birth of her only child, Esther Ambrose, the contestant. The deceased's other daughter, Mrs. Roy Crowder, preceded him in death, and was survived by four children, the proponents Beth Clausen, Bertha Redman, and John and Earl Crowder. The proponent Robert Sullivan was named as executor of the will. Deceased owned his residence in Woodbine and farm land in Shelby and Harrison counties, and personal property. Had deceased died intestate, Mrs. Esther Ambrose, the contestant, would have received an undivided one half of decedent's property, and the other four grandchildren would have received the other half.

Under the proposed will, Mrs. Ethel Waddell, who had been the testator's housekeeper from March 1937 until his death, was given his automobile and all the household property in his home. The remainder of his property was given in equal shares to his five grandchildren, subject to the provision that the farms and equipment should be operated under control of the executor for five years after testator's death and the net profits divided annually among the grandchildren.

The deceased had made earlier wills which had been deposited in the clerk of court's office and withdrawn, as shown by the signature of W. B. Puckett on the will register. Puckett had done his banking business with Robert Sullivan, but while the latter was in the service Puckett had transferred such business to the First National Bank of Woodbine. Robert Sullivan had operated the office at Panama, Iowa, of the State Bank of Portsmouth, to which office he returned in January 1946 after leaving the service. Sometime in June 1946 Puckett discussed with Earl E. DePue—who apparently had been designated executor in the will of Puckett—the making of a new will, giving his property equally to his grandchildren. He also discussed the same matter with J. E. Roundy, an old friend and business associate. DePue told Puckett that, since Sullivan was back, it might be better to name him as the executor. Puckett talked to Sullivan and the latter told him he would act as executor, but declined to draw the will, and suggested that a lawyer be employed to do so.

On July 15, 1946, Puckett and Mrs. Waddell went to the clerk's office at Logan, Iowa, and withdrew the will there on file, which was in a sealed envelope, and, on July 20, 1946, Puckett took it to a stenographer at the First National Bank of Woodbine. She testified that he asked her to make a copy of the will with but one change—the nature of which change she did not recall. While he waited she made an original and a carbon copy of the will. Except for the change she made an exact copy of the old will, including misspelling, punctuation and other errors. The will, as copied, consisted of two sheets of white legal cap paper. On the first sheet, paragraphed and single spaced, was the will itself and a blank line for the testator's signature, and also three lines of the attestation clause. The month and day of the date stated in the will and in attestation clause were left blank. On the second sheet, which was marked at the top with the numeral "II", were the last two lines of the attestation clause, with two blank lines for the signatures of the witnesses. The typist stapled the two sheets of the original, and the two sheets of the carbon copy, separately. The stapling machine was a common type using a wire staple which by a blow

on the compressor forces the ends of the staple through the papers and clinches the staple on the other side. Each set of papers was fastened with two staples. Puckett left the bank with these papers and an envelope and arrived at his home about ten-thirty in the forenoon of July 20, 1946. He read the carbon copy and noticed that the date in the will and in the attestation clause was "1945", as in the old will, and that the address of Robert Sullivan was typed as "Logan" instead of "Panama". He had Mrs. Waddell correct the carbon copy by crossing out "Logan" and by inserting "Panama" just above, and by striking the figure "5" in each date line and inserting instead the figure "6", to make the year appear as "1946" in both places. She also filled in the day and the month in the will and the attestation clause to show the date was the "20 day of July, A.D., 1946." These corrections and changes were made by Mrs. Waddell with an indelible lead pencil which Puckett customarily carried. Shortly afterward, Frank Voss, the groceryman, delivered some groceries in the kitchen, and Mrs. Waddell told him to wait as Mr. Puckett wished to see him. Puckett then came into the room with the carbon copy in his hand and stated that it was his will, and asked Voss and Mrs. Waddell to witness his execution of the will. Puckett then signed his name to the will in the presence of Voss and Mrs. Waddell, and each of them, in the presence of the other and of Puckett, signed the attestation clause as witnesses. Puckett placed the executed will in the envelope and sealed it. Mrs. Waddell wrote the name "W. B. Puckett" on the outside of the envelope. Puckett and Mrs. Waddell then drove to the clerk of court's office at Logan, and the sealed envelope was left for safekeeping with the clerk. The envelope, Exhibit 1, by the rubber stamp of "Laura Leonard, Clerk" on it, shows that it was filed in her office on July 20, 1946.

The clerk of court testified to the filing of the will as noted above, and also that on October 6, 1947, in the presence of Mrs. Waddell, C. D. Erlewine, Mrs. Ambrose, and Mr. Elston (her lawyer) the envelope was opened and the will, Exhibit 1-a, was found therein and was read. The clerk fixed November 3, 1947, at ten a.m. as the time for probate. On November 1, 1947, Esther Ambrose, as contestant, filed written objections to the probate of the will on the following grounds:

"* * *. 6. Said instrument shows that it is not subscribed to by two witnesses. That two persons subscribed their names to their certificate following the purported will did not constitute subscribing their names to the purported will. By reason of these facts the execution thereof was insufficient to make a valid will.

"7. Said instrument shows on its face that it was not witnessed by two competent and disinterested witnesses, by reason whereof the execution thereof was insufficient to make it a valid will."

On December 30, 1947, the contestant amended her objections by adding paragraph 8:

"That the said purported will of W. B. Puckett is not in fact his will for that it was not signed by him; that the purported signature of W. B. Puckett appearing thereon is in fact not his signature; that said purported will was not signed by some other person in his presence and by his express direction writing his name thereto."

Proponents, by answer, denied the allegations in the objections.

The trial to court was begun on April 2, 1948, and continued at intervening times until its conclusion on August 13, 1948. Each side, at the close of all testimony, moved for a directed verdict. The court stated that it would pass upon them in ruling on the merits of the case. The court concluded that the motions should be overruled and proceeded to find and hold that the evidence failed to sustain the contestant's objections to the will, but established that the will had been duly executed by the deceased and witnessed by two competent witnesses, all as provided by law.

We agree fully with the trial court's findings, conclusions and judgment.

The attesting clause of the will was as follows:

"We certify that on the 20 day of July 1946 at Woodbine, Iowa W. B. Puckett to us personally known did in our presence sign the foregoing instrument and declare it to be his last will

*and testament, and we* at his request and in his presence and in the presence of each other, do hereunto subscribe our names as witnesses.

Ethel Waddell

Frank Voss."        (Italics added.)

The italicized part of the clause appears on the first sheet of the instrument, Exhibit 1-a, on which the entire will is typed, and the part not italicized, including the signatures of the subscribing witnesses, is typed at the top of the second sheet. Just above the attestation clause, and just above the signature of the testator, and being the last three lines of the will, is the following sentence: "In witness whereof I have to this my last will and testament subscribed my name this 20 day of July 1946 *in the presence of the hereinafter subscribed witnesses.*" (Italics added.)

The signature of the testator and of each of the subscribing witnesses was made with an indelible lead pencil.

I. After providing (in chapter 633, Code of 1946) for the execution of certain verbal wills and wills of soldiers and sailors in certain situations, section 633.7 provides: "All other wills, to be valid, must be in writing, signed by the testator, or by some person in his presence and by his express direction writing his name thereto, and witnessed by two competent persons."

Code section 633.9 provides: "No subscribing witness to a will can derive any benefit therefrom unless it be signed by two competent and disinterested persons as witnesses thereto, besides himself, * * *."

Ethel Waddell, by said section, was disqualified as a legatee, but not as a witness. See In re Estate of Rehard, 163 Iowa 310, 313, 143 N. W. 1106, 1107, where the court said: "The apparent purpose of this statute is to save the competency of a witness to a will even at the expense of the benefit which he might otherwise receive thereunder." See also In re Will of Kenney, 213 Iowa 360, 364, 365, 239 N. W. 44, 78 A. L. R. 1189; In re Estate of Farley, 237 Iowa 1069, 1079, 1080, 24 N. W. 2d 453. To avoid the statutory provision, she filed in the estate in the clerk's office on April 2, 1948 a written declination to accept under the will, which stated that she did not

waive her right to file a claim against the estate of deceased for her services.

II. Contestant assigns twenty-two errors in support of her demand for reversal. Their similarity makes consideration of but a few of them necessary. Proponents' first witness was Frank Voss, a subscribing witness to the will. After stating his residence, business and long-time acquaintance with the testator, this examination followed:

"Q. I hand you what the reporter has marked Exhibit 1-a, purporting to be the last will and testament of W. B. Puckett, deceased, and I will ask you to state whether or not it bears your name and signature? (Objection "as incompetent, no sufficient foundation has been laid to show the competency of the witness", was overruled by the court.) A. Yes. I have my signature on it here. Q. At whose request did you sign your name to Exhibit 1-a? (Same objection was overruled.) A. Mr. Puckett. Q. And for what purpose did you sign your name to Exhibit 1-a? Mr. Havens: Objected to as calling for a conclusion and opinion of the witness, and incompetent, irrelevant and immaterial; and it does not appear his name is signed to the will or subscribed to it.

"Court: Overruled.

"A. It was to witness his signature. Q. I will ask you to examine Exhibit 1-a, and state whether or not the writing subscribed thereto, Ethel Waddell, was signed in your presence by her? A. It was. Q. State whether or not your signature was made in the presence of Ethel Waddell to Exhibit 1-a? A. Yes.

"Mr. Havens: Objected to as immaterial, irrelevant and incompetent.

"Court: Overruled.

"Q. State whether or not the signature of yours and Ethel Waddell were made in the presence of and at the request of the decedent?

"Mr. Havens: Same objection.

"Court: Overruled.

"A. They were. Q. What, if anything, did the decedent say to you and to the other witness concerning the nature of the instrument, Exhibit 1-a?

"Mr. Havens: Objected to as incompetent, irrelevant and immaterial.

"Court: Overruled.

"A. Why, he said it was his will. Q. State whether or not the signature of the decedent, W. B. Puckett, on Exhibit 1-a was made by the decedent in your presence? A. It was. Q. State whether or not it was signed in the presence of Ethel Waddell also? A. We were all three there. Q. All three were present at the time it was signed? A. Yes, sir. Q. He signed in your presence and in her presence? A. That's right. Q. I will ask you to state whether or not you observed W. B. Puckett sign his name to Exhibit 1-a? (Objection of incompetent, irrelevant and immaterial was overruled.) A. I did, yes. Q. And who was present at the time he signed his name to Exhibit 1-a? (Same objection as last stated was overruled.) A. Ethel Waddell and Mr. Puckett and myself. Q. I would like to have you re-examine Exhibit 1-a and state whether or not it is in the same condition as the day you signed Exhibit 1-a as a witness?

"Mr. Havens: Objected to as calling for a conclusion of the witness and no sufficient foundation laid to show the competency of the witness to answer such a question.

"Court: Overruled.

"A. I would say, yes."

The cross-examination simply confirmed the direct examination. On redirect examination this question was asked the witness Voss:

"Q. Identifying Exhibit 1-a as pages 1 and 2, I will ask you to state whether or not pages 1 and 2 are identical and the same pages as were executed in the Puckett home that time you have testified to?

"Mr. Havens: Objected to as incompetent, calling for a conclusion of the witness; no sufficient foundation has been laid to show the competency of the witness on that point.

"Court: Overruled.

"A. I would say, yes."

Mrs. Ethel Waddell testified:

"Exhibit 1-a bears my name and signature. I signed it at the request of Mr. Puckett. The signature of Mr. Puckett was made in the presence of Frank Voss. Mr. Puckett asked me to sign his will. When I signed it Mr. Puckett and Mr. Voss and I were present and we all three signed in the presence of each other. * * * Those four sheets of paper which Mr. Puckett had when he came back from the bank consisted of two sets of two sheets each and each set was stapled together. One was an original containing two sheets and the other was the duplicate copy. The duplicate carbon was the one that was actually executed which I have testified about."

The will, Exhibit 1-a, was offered and received in evidence at the close of the testimony of Mr. Voss, and was reoffered and received in evidence after Mrs. Waddell testified. To each offer this objection was made: "The contestant objects to the offer at this time on the ground the instrument has not been sufficiently identified as the last will and testament of W. B. Puckett." Each time the objection was overruled, and rightly overruled.

In argument in this court, contestant states:

"The first question illustrates wherein all of them involved in this division were improper. 'I hand you what the reporter has marked Exhibit 1-a, purporting to be the last will and testament of W. B. Puckett, deceased, and I will ask you to state whether or not it bears your name and signature.' Objection being overruled, it produced the answer, in effect, that the witness had subscribed his name to the will. This was an ultimate fact for the court to determine and such answer was incompetent for this reason. And further, the testimony of this witness should have been confined to such foundational matters as were within his actual knowledge, such as that it was his signature on page two of Exhibit 1-a; that when testator signed his name on page one and declared it to be his last will and testament and requested him to witness it the two identical pages now appearing as parts of Exhibit 1-a were fastened together; etc. But without having first shown such foundational matters to be within the actual knowledge of the witness the question as stated simply calls for a conclusion. It is one thing to say that it was

his signature on page two of the exhibit. That would be a matter within his own knowledge. But it is quite another thing to say that his signature on one sheet of paper is subscribed to an instrument purporting to be the last will and testament of W. B. Puckett when such will appears complete on another sheet of paper. Unless and until it was made to appear that such statement was based on actual knowledge that the two identical sheets constituted one instrument at the time it was signed it would be only conclusion and speculation.

"What we have said concerning the improper form of the question involved in error I applies generally to the questions involved in the other errors included in this division. Therefore, we consider it unnecessary to discuss each of them separately."

▉▉ We have set out each question, objection and ruling of the court. We find no merit in the objections or in the supporting argument. Exhibit 1-a was one document consisting of two sheets of paper. On its face it appeared or purported to be the will of W. B. Puckett with an attestation clause for the witnesses to sign. At the top of the first sheet was the statement: "Last Will and Testament of W. B. Puckett." Voss testified that he saw the statement. Witnesses to a will do not ordinarily read its contents. Voss did not read this will. It was not necessary that he do so or know its contents in order to qualify himself as a witness to its execution. See Scott v. Hawk, 107 Iowa 723, 725, 77 N. W. 467, 70 Am. St. Rep. 228. Puckett told him that it was his will and that he was going to sign or execute it and he asked Voss if he would witness his signing or execution. That was sufficient for Voss. He signified his willingness. He testified that Puckett signed the will in his presence and in the presence of Mrs. Waddell, to whom he had also announced that it was his will and had requested her to witness its execution. Puckett executed the will in the presence of Voss and Mrs. Waddell, and each of them in the presence of the other and of Puckett signed the attestation clause to evidence their witnessing of the execution of the will. Their testimony sufficiently establishes that the will was executed and witnessed as required by Code section 633.7, supra. Every answer given by Voss was not an opinion or conclusion but was a statement of a fact, to wit:

Puckett announced to them that it was his will; he asked them to witness his signing of it; he signed it in the presence of each of them; and Voss and Mrs. Waddell signed in the presence of each other and of Puckett; the will, Exhibit 1-a, when shown to the witness at the trial was in the identical condition that it was when executed by the testator and witnessed by Mrs. Waddell and Voss. The statement in the question that the exhibit purported to be the will of Puckett may have been in the nature of an opinion or conclusion, but that was of no materiality. It was simply an identification for the record of an exhibit. The question would have been sufficient had it merely stated, "Does Exhibit 1-a bear your signature?" The exhibit on its face showed what it purported to be and it was for the court to determine what it was. The two sheets of the document were not only stapled together and identified as one instrument, but the sequence and connection of the words and the clarity and continuity of the thought expressed in the attestation clause showed that the two sheets were proper parts of one instrument—the will of Puckett and the attestation clause evidencing its execution. It is said in Roche v. Nason, 105 App. Div. 256, 265, 93 N. Y. S. 565, 572, that: "Where a will consists of two or more pages of typewritten matter fastened together, and this is the physical condition at the testator's death, there is a presumption that the sheets were so bound together at the time of the execution thereof as a will."

It is not essential to the validity of a will consisting of more than one sheet of paper that the sheets be fastened together. It is enough if they reasonably appear to be each a proper part of a completed will. As stated in 57 Am. Jur., Wills, 189, section 225:

"There is no dissent from the rule that a will may be valid although written on separate sheets of paper, if the several sheets are coherent in sense. * * * A persuasive element in favor of a will written on loose unconnected sheets is material sense, the correlation of thought identified and carried through each loose sheet." On page 188, section 224, of the same volume it is stated: "Without question, a valid will may be written on more than

one piece of paper where the sheets are stapled together with a mechanical fastening."

In Sellards v. Kirby, 82 Kan. 291, 293, 108 P. 73, 28 L. R. A., N. S., 270, 136 Am. St. Rep. 110, 20 Ann. Cas. 214, the court said:

"As the first four pages happened to end with incomplete sentences, the connection of the subject matter made as effective a union of the several parts as could have been accomplished by their physical attachment. 'It is a rudimental principle, that a will may be made on distinct papers. * * * It is sufficient that they are connected by their internal sense, by coherence or adaptation of parts.' (Wikoff's Appeal, 15 Pa. St. 281, 290, 53 Am. Dec. 597. See, also, 30 Am. & Eng. Ency. of Law 580.) The sequence of the pages was indicated by figures placed at the top of each, as well as by the connection of the language * * *."

In Exhibit 1-a the second page is numbered, the two sheets were firmly stapled and are also clearly connected by the continuity and coherence of the typed statement thereon. The fact that the two sheets of paper constituted the complete and executed will of the testator is evidenced by the direct and competent testimony of two competent, disinterested and unimpeached witnesses.

The testimony objected to by the contestant was neither incompetent, immaterial, irrelevant, opinions or conclusions, and neither Voss nor Mrs. Waddell were incompetent witnesses.

Speaking of the attestation clause of the will, we said in In re Estate of Olson, 239 Iowa 1149, 1154, 34 N. W. 2d 207, 210:

"Such a clause, reciting the observance of statutory requirements as to the execution of the will, raises a presumption of the due execution of such will, if proof is made of the genuineness of the signatures of the witnesses and testator. This is the general rule and so held in Iowa. [Citing cases.] And even where there is no attestation clause, the same presumption arises. * * * Also, the rule is that every presumption will be indulged in favor of the due execution of a will." (Citing cases.)

III. The testator was afflicted with palsy for ten or twelve years before his death which caused a tremor and shaking of his hands and arms. There is no claim made of any mental or testamentary incapacity of the testator. Any evidence in the record is all to the contrary. Over three hundred fifty of his canceled checks for the years of 1945, 1946 and 1947 show the transaction of much business of various kinds by him. Most of these checks were signed by him, but, because of his difficulty in writing, he customarily had the person to whom the check was given fill out the blanks in the check and then he would sign it.

The evidence on which contestant relies to sustain her contention that the signature of the testator on the will is a forgery is testimony of herself and one or two others that because of his palsy it was impossible for the testator to have signed his name on the will. The record is overwhelmingly to the contrary. She also relies upon the testimony of a self-styled expert on handwriting and questioned documents. This witness had a "photography shop and oil station on the east edge of Logan." He testified that he had "an innumerable bunch of hobbies. I have a great number of hobbies. I make a hobby out of portions of my business especially legal evidence, and things of that kind. For about 24 years I have devoted time and study to the matter of questioned documents. * * * I have never made my principal business that of handwriting expert or an expert on the question of documents. I have testified in court to disputed signatures two or three times anyhow." He particularly specialized in the handwriting of persons having palsy. He testified that in his opinion the signature on the will, Exhibit 1-a, was not that of W. B. Puckett. In surrebuttal he gave opinions respecting the signatures on many exhibits. Some of his answers indicated his opinion that a certain person other than the testator wrote the name of the latter on the will.

Substantially every witness who knew the testator or saw him write or did business with him—and there were many of them—testified that his ability to write varied greatly, depending upon surrounding circumstances, his state of mind, or whether he was tired. Sometimes the tremor of his hand was so great

that he could not write at all, or he could not finish his signature, but, after relaxing or composing himself, he wrote or completed his signature. It always took him a minute or more to write his name. He wrote more readily at home or where it was quiet or early in the day, when he was less tired. His housekeeper, Mrs. Waddell, who went with him much and drove his car often signed his checks, usually writing "Ethel" under his name, but sometimes omitting to do so. Her writing did not resemble his. The lines in his writing uniformly showed the tremor of his hand.

Exhibit 138 was a check for $75, which he gave for a war bond. Mrs. Betty Waite filled out the body of the check, but after writing "W. B." he was unable to write "Puckett" and she wrote it for him and so indicated on the check. A number of witnesses testified to similar experiences. John Redfield, cashier of the Woodbine Municipal Light Plant, filled out many checks for Puckett and watched the latter sign them. These checks are Exhibits 19, 56, 80, 89, 36. The witness testified: "It was more difficult at times than others for him to sign his name. Sometimes he could sign good and sometimes it was very difficult for him to sign, and then later he could sign good again."

Many other businessmen, bankers, county officers, assessors, farmers, clerks, garagemen and others gave similar testimony. They referred to numerous checks introduced as exhibits, which they had filled out and then watched the testator sign. Many of these checks and documents were signed by the testator in 1946, both before and after July 20, 1946, the date the will was executed. Others were signed in 1947.

Other witnesses who knew Puckett well and were familiar with his signature testified that in their opinion the signature to the will was his. The will register in the office of the clerk of the district court of Harrison county, in which Puckett had twice signed in receipt of wills, was in evidence; also two farm leases which he signed; also a deed which he acknowledged on March 7, 1947 before Mr. Havens, attorney for contestant, was an exhibit.

A handwriting expert of thirty years' experience as a specialist in handwriting and questioned documents, who had testi-

fied in various federal and state courts, and court martials in Nebraska, Iowa, and the Dakotas, compared the signature on the will with several signatures of the testator conceded to be genuine, and testified that they were all made by the same person.

Contestant stresses these queries: Where did the form and context of this peculiarly constructed will originate? Why was not an attorney employed to draw the will? Why was it not executed in the bank instead of in his home? Why was a beneficiary a witness to the will? Why were all corrections, insertions and signatures made with a lead pencil? Why did Ethel Waddell write the testator's name on the sealed envelope? Why was a carbon copy used? Why did the will dispose of land which he had conveyed on March 7, 1946? Why was it loosely stapled?

Many of these queries are of no substantial significance. The old will which the typist copied was made in 1945 and described the land thereafter conveyed in March 1946. He no doubt overlooked this fact when he told the stenographer to make an exact copy of it. There is nothing strange about the will or its form. The old will was probably drawn by a lawyer or copied from a form book, as it contains legal phrasing found in many wills. Why the carbon copy was used does not appear. But the original copy was preserved, unexecuted and was admitted as an exhibit.

One might also query just why would anybody forge the testator's name to this will? It was an exact copy of his earlier will with respect to the devises. Was his signature to that will also forged? He made the new will simply because he wished Robert Sullivan to look after his farms during the five years following his death. How could the forgery have been effected? The copy was made in the First National Bank in the morning of July 20, 1946. It was taken home at once and executed. He at once took it up to the clerk's office at Logan where the sealed envelope was stamped "filed" by the clerk on July 20, 1946. It remained in the vault of that office until it was opened on October 6, 1947.

This appeal is not a review de novo. We pass only on

the errors assigned. The action being at law and tried to the court, the findings of fact by the court have the effect of a special verdict, and are equivalent to the verdict of a jury. One of the facts found by the court was the execution of the will as required by Code section 633.7, supra. Since these findings of fact and the judgment based thereon are supported by substantial evidence, and are justified, as a matter of law, they will not be disturbed on this appeal. These principles of law have been many times announced by this court. See In re Estate of Early, 234 Iowa 570, 573, 576, 13 N. W. 2d 328; In re Estate of Olson, 239 Iowa 1149, 1154, 34 N. W. 2d 207, 210, supra; Davis v. Knight, 239 Iowa 1338, 1340, 1341, 35 N. W. 2d 23–25, and cases cited.

The order, decree and judgment of the district court is— Affirmed.

All JUSTICES concur except MANTZ, J., not sitting.