GUS DROSOS, appellant, v. JENNIE DROSOS and ALEX KARRAS, appellees.

No. 49979.

(Reported in 103 N.W.2d 167)

MAY 3, 1960.

Orr & Furlong, of Sioux City, for appellant.

Whicher & Davis, of Sioux City, for appellees.

GARFIELD, J.—Gus Drosos brought this law action against the widow (Jennie) and Alex Karras, who was called a nephew, of his deceased brother William, contesting the brother's will on the grounds of mental incapacity, undue influence of defendants and lack of proper witnessing. At the conclusion of the trial a verdict was directed against plaintiff on the ground of insufficient evidence the will was invalid in any of these respects. From judgment thereon plaintiff has appealed.

The principal question is whether there is sufficient evidence of (1) testator's alleged mental incapacity at the time the will was made, or (2) that the will was the result of defendants' undue influence, or (3) was not properly witnessed. Other questions are also presented.

William A. Drosos, the testator, came to America from Greece in 1910. Gus, the plaintiff, came in 1913. From about 1919 until his death March 19, 1958, at the age of 64, William operated a small grocery store in Sioux City. Gus worked in the store from 1922 until sometime in 1926 or perhaps 1928 and some thereafter. The brothers lived together until William married Jennie, 20 years younger than he, in 1944. They had no children. Gus continued to live in the small house owned by William at the rear of the grocery store. Gus had a stroke in 1949 which largely incapacitated him from work. William never asked Gus to pay rent on the house he lived in and none was paid.

William had diabetes and heart trouble. He was hospitalized March 11, 1958, for the last time. After two weeks stay there he had been released from the hospital to go to his home only a few days earlier. While at his home on March 10 he had severe pains in his left hip, probably caused by hemorrhage into the muscle. The pains continued on March 11, requiring narcotics for their relief. He was about the same on the 12th although the pain was less severe. William had a bad night on the 12th–13th and a lot of trouble speaking and swallowing. According to the hospital records, on the 13th he was speaking much better, there was no paralysis, sensations intact, "has had a small stroke, progress fair."

On the 13th Jennie asked Dr. George G. Spellman, her husband's physician, if William was critically ill and if she should remind him he did not have a will. The doctor advised that William should get his affairs in order and so informed his patient. After the doctor left the hospital room Jennie asked her husband if he wanted her to call George Pappas who had been his attorney about five years. William replied he thought it would be a good idea. So Jennie telephoned Pappas that her husband wanted to see him at the hospital. At 7:30 that evening

Pappas went to the hospital after trying, without success, to talk to Doctor Spellman. Walter Sutherland, a partner of William in the grocery store, and Mrs. P. Margias, whose husband was a cousin of Jennie, were also in the room. Jennie had gone home to rest. Pappas asked William if he sent for him, was informed he had and that the matter was personal. Pappas then requested Sutherland and Mrs. Margias to leave the room. The lady left but Sutherland remained in the room at William's direction.

Pappas testifies he conversed in Greek with William about an hour, William said he wanted to make a will and told the witness just what he wanted in it. Pappas relates what William told him, he made notes of the directions given him and they were received in evidence. He says the only change in testator's normal speech is it was slower; Sutherland was the only other person present during the conversation; neither he nor the witness made any suggestion as to contents of the will; about 8:30 to 8:45 he told William he would prepare the will and return the next day and then left the hospital; he talked to Doctor Spellman by telephone twice that evening; the doctor advised having the will executed that night; Pappas then prepared the will and returned to the hospital with it about 11; Mrs. Margias and Sutherland were in the room with testator; the former left but Sutherland again remained at William's request.

Pappas says he read the entire will to the testator; the latter noticed the will incorrectly described his home as on "S. Helen Street" rather than "N. Helen" and the mistake was corrected; William also supplied the correct street number of two other residences he owned; after Pappas read the will he handed it to the testator who looked at it and said it was his will; Pappas asked nurses to act as witnesses to the execution but they declined as contrary to hospital policy; Mrs. Margias, Sutherland and Pappas then witnessed the execution of the will; William signed his name without assistance; only the testator and witnesses were present; Pappas sealed the will in an envelope and told no one of its contents until it was admitted to probate on

March 31; William was fully competent mentally when the will was executed.

Sutherland corroborates much of Pappas' testimony although in less detail. He also testifies that after Pappas handed the will to William and he looked at it, William handed it to the witness and asked him to read it; also that he fed William his evening meal on the 13th, consisting of mashed potatoes, green beans, meat loaf and tea. Further, that the testator asked him if he should make a will and the witness replied it was his own personal business. He thought William was mentally alert and of sound mind.

Doctor Spellman testifies at some length, in part from the hospital records. He says the last time a narcotic was administered to William before the will was executed was at 5 a.m. March 12—for relief of pain; its effects would wear off in three hours; at 3:30 and 7 p.m. on March 13 he stood at the side of his bed, with help, to void his urine; the witness saw him in the forenoon and in the evening about 9:30; William conversed with the witness; his speech was somewhat slurred; he knew what he wanted to say but had difficulty putting it in words; he said he wanted to make a will; he knew what was going on; his intellect was all right; he was mentally competent on the evening of March 13th and the next morning; on the 14th William was a little worse and failed thereafter until he died from a stroke on the 19th.

The will leaves his wife testator's home, his bonds and two bank deposits; also a half interest in testator's share of the grocery business, a like interest in a rental property, the contents of his safe at the store and any property not otherwise disposed of. (It is not shown there is any such other property nor does the value of the contents of the safe appear.) The remaining half interest in this rental property and share of the grocery business, together with the store building and small house at the rear thereof, are left to defendant Alex Karras. A bank account of $2141.87 is left to plaintiff. The will nominates the wife, Jennie, as executrix without bond.

The will nominates Mr. Pappas as attorney for the estate and directs him to collect a note signed by Thomas Pappas (not

related to the attorney) and pay the proceeds to Jennie. The attorney was unable to collect the note. The will contains this provision, directed to Jennie and Alex, regarding the grocery business: " 'I request that they retain * * * Walter Sutherland in the same capacity and profit sharing plan now in operation.' " Because of these provisions plaintiff contends Pappas and Sutherland could not legally witness the will.

Alex Karras is a son of a first cousin of William. He called William "uncle" and William called him "nephew." Alex lived with the Drosos since he came from Greece May 1, 1952. Since sometime in 1953 he worked in the grocery. William and Jennie "signed for his financial responsibility" when Alex came from Greece.

Most of the testimony summarized above is from important witnesses for defendants. We have referred to it first because there is no evidence for plaintiff regarding execution of the will and no direct evidence as to testator's condition at that very time.

Plaintiff testifies his brother had a stroke at his home on March 10. He did not see William that day and does not state how he knew he suffered a stroke. Plaintiff does say he saw his brother every day from March 11 until he died on the 19th; he was looking into space; he looked and acted like a dead man; plaintiff never heard him utter a word during this period; there was no difference in his condition on the 13th; plaintiff moved his fingers in front of William's eyes but he made no response to such movements; there was a "No Visitors" sign on the door to his hospital room throughout the 8-day period; his brother's signature is not on the will; he had no trouble with William— just little arguments, not too serious. Another witness testifies it does not seem to him the signature to the will was William's.

Mary Mehess, a relative of plaintiff, says she saw William on March 12. He was paralyzed, could not speak, could not look, hand was very cold, his eyes were glassy, she could not tell if he were looking at her or into space. Also that two years before he died William said he had a will made out and left money to everyone he wanted to remember and he thought, since plaintiff was ill, he would add his name to his (William's) bonds.

Mrs. Vernon Prewitt was in William's room five or ten minutes "a week or so" before he died. She testifies he could not talk and made no movement.

Alex Kazos and Harry Stetson called to see testator. One says he was practically unconscious, the other that they could not make him "come to." Stetson's cross-examination makes it clear this was on March 15 or 16 when William's condition was considerably worse than when the will was made.

Mrs. Sophie Katsis visited the testator one evening "about the 13th." She testifies he said nothing to her, made no movement while she was there and was getting his food through the veins. Another long-time friend says she never saw plaintiff and his brother arguing.

This is a summary of the evidence for plaintiff. No witness expresses an opinion, nor was asked for one, the testator was of unsound mind when the will was made. Plaintiff offered no medical testimony. No nurse was called to testify. It is true plaintiff says over and over—some 15 times in all—his brother was "dead" each time he saw him from the 11th to the 19th. Of course he was not dead when the will was executed. And Doctor Spellman insists a lot of people recover from such a stroke as William had then experienced and he had a good chance on the 13th of coming through it. Some light is thrown on plaintiff's testimony by his answer that when he had his own stroke he was "just dead." It does not appear William suffered the same kind of stroke before the will was made that plaintiff had.

It is clear that if evidence for defendants is believed the testator was mentally competent when the will was executed. Their testimony is directed to this very time. It is entirely possible to reconcile plaintiff's evidence with that of defendants. As above indicated, some of the testimony for plaintiff refers to times after the will was made when William's condition was considerably worse than on the evening of the 13th. One witness frankly admits he imagined William was sound asleep during his visit to the hospital so he did not bother him but left. It is quite possible that at other times to which witnesses refer, the testator was asleep or wholly or partly under the influence of

narcotics or other sedatives. At times, as on the 12th, he was suffering severe pain. He was critically ill and very likely did not care to visit. None of plaintiff's witnesses says definitely that he saw William on the evening of the 13th. Plaintiff is the only one who testifies positively he saw him that day or evening.

■■ I. Mental incapacity which invalidates a will must refer to the exact time it is made. In re Estate of Kenny, 233 Iowa 600, 605, 10 N.W.2d 73, 76; In re Estate of Rogers, 242 Iowa 627, 631, 47 N.W.2d 818, 820, and citations; In re Estate of Ruedy, 245 Iowa 1307, 1313, 66 N.W.2d 387, 390; 94 C. J. S., Wills, section 5; 57 Am. Jur., Wills, section 78; Annotation, 166 A. L. R. 969, 970. It is true evidence of testator's condition of mind at other times may be received if there is reasonable basis for the conclusion it throws light upon his mental competence when the will was made. Authorities supra.

The rule that mental incapacity must refer to the very time of making the will is important in a case such as this where no long-standing mental impairment such as senile dementia is claimed. There is not even a scintilla of evidence testator was not competent to make a will at least until March 10. If he were incompetent on the evening of the 13th it would be from a condition that arose on or after the 10th. Further, in view of testator's turn for the worse within a day or two after the will was executed, as clearly shown by the medical testimony and hospital records, it cannot be said evidence of his mental condition on these later days throws much light on his competence on the evening of the 13th.

■ It is scarcely necessary to repeat here what we have said so many times that mental capacity of a testator means his capacity to (1) understand the nature of the instrument he is executing, (2) know and understand the nature and extent of his property, (3) remember the natural objects of his bounty, and (4) know the disposition he desires to make. In re Estate of Burrell, 251 Iowa 185, 194, 100 N.W.2d 177, 183, and citations; In re Estate of Ruedy, supra, 245 Iowa 1307, 1314, 66 N.W.2d 387, 391; In re Estate of Rogers, supra, 242 Iowa 627, 630, 47 N.W.2d 818, 820, and citations. See also 94 C. J. S., Wills, section 15a, page 692; 57 Am. Jur., Wills, section 64.

■ The burden rested upon the contestant to prove the testator lacked one or more of these essentials at the time the will was executed. Authorities last above and citations therein. We cannot find substantial evidence of such incapacity.

There can be little doubt William fully understood he was making his will. He accurately described his property to his attorney and was sufficiently alert to discover a mistaken street location and supply two street numbers his attorney did not know. He correctly named the three banks in which he had deposits. He remembered the natural objects of his bounty. Although plaintiff doubtless feels the bequest to him should have been larger, there is no suggestion anyone with a claim upon his bounty was overlooked. It seems equally clear testator knew the disposition he desired to make of his property.

This will can hardly be called an unnatural one. In determining the extent of the bequest to plaintiff William may well have had in mind his brother occupied the small house rent-free 19 years in all, and had been receiving a disability pension from Social Security since 1949. In any event the property was William's and he had a right to dispose of it as he pleased if mentally competent and free from undue influence.

■ We have repeatedly pointed out the law is slow to deny the right of anyone to dispose of his property by will as he sees fit. No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the tests above set forth, invalidates his will. It is not essential to testamentary capacity that the maker be able to make contracts or carry on business generally. In re Estate of Hollis, 234 Iowa 761, 768, 12 N.W.2d 576, 580, and citations; In re Estate of Rogers, supra, 242 Iowa 627, 630, 631, 47 N.W.2d 818, 820; In re Estate of Ransom, 244 Iowa 343, 378, 57 N.W.2d 89, 108; In re Estate of Ruedy, supra, 245 Iowa 1307, 1314, 1315, 66 N.W.2d 387, 391, 392. See also 94 C. J. S., Wills, section 15d, pages 699 to 703.

■ The testimony of Mrs. Mehess as to a declaration of the testator two years before the will was made concerning his then intention toward plaintiff is entitled to little if any weight. He had a perfect right to change his mind. In re Estate of Groen,

245 Iowa 634, 646, 647, 62 N.W.2d 143, 150; In re Estate of Klein, 241 Iowa 1103, 1118, 42 N.W.2d 593, 601, 602; In re Will of Diver, 214 Iowa 497, 502, 503, 505, 240 N.W. 622.

Although we have tried to summarize all the evidence for plaintiff we have not mentioned all that was offered by defendants. We will refer to one other piece of testimony that seems rather significant. Sutherland testifies that on the afternoon of March 13 he talked with William as to the amount of blood that had been given him in transfusions. This was in an effort to ascertain whether the hospital had overcharged him therefor. The testator stated the correct amount of blood used and the sum he should have been charged therefor, which was $25 less than the amount of the hospital's bill.

One or the other of two excerpts from Bales v. Bales, 164 Iowa 257, 275, 276, 145 N.W. 673, 680, has been frequently quoted or paraphrased in later decisions in will contests. The first of these excerpts is: "* * * it is not the duty of the court to submit the case to the jury because there is some evidence introduced by the party having the burden of proof, unless that evidence is of such a character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence."

II. There is no proof the will is the product of undue influence exercised by either the wife or "nephew", Alex Karras. It is true Jennie evidently spent a good deal of time in her husband's hospital room and may have had opportunity to influence him unduly. It was of course entirely proper for her to attend him during his illness. Nor is it evidence of *undue* influence that his wife reminded William he had no will and asked if he wanted her to call his attorney. Before doing so she obtained the advice of the attending physician. It is not shown she solicited a will in her favor. There is no evidence Jennie dominated her husband in the making of his will or in any other matter.

It is of course true that undue influence may be proven by circumstantial evidence. But the issue must not be left to conjecture. Undue influence must be such as to substitute the will of the one exercising it for that of testator, thereby

making the instrument express the intent of such person, not of the testator. It must operate at the very time the will is made and control its making. It is not established by proof of opportunity and disposition to exercise it. Importunity, request and persuasion that do not control the will are not enough. In re Estate of Klein, supra, 241 Iowa 1103, 1118, 42 N.W.2d 593, 602, and citations, which fully support our holding on this issue. To like effect are In re Estate of Moeller, 247 Iowa 174, 182, 73 N.W.2d 15, 19, and citations. See also Gillette v. Cable, 248 Iowa 7, 18, 79 N.W.2d 195, 202. (The Klein case, supra, also supports our holding on the issue of mental capacity. See too Convey v. Murphy, 146 Iowa 154, 124 N.W. 1073, where the will was executed two hours before death.)

In re Estate of Lochmiller, 238 Iowa 1232, 30 N.W.2d 136, affirms withdrawal from the jury of the issue of undue influence although a jury question was presented on mental incapacity. The case is stronger than this one on undue influence.

III. As previously stated, plaintiff contends Pappas and Sutherland could not legally act as witnesses to the will. Basis for the contention is that the instrument nominates Pappas as attorney for the estate and directs him to collect a note payable to testator and *requests* Jennie and Alex to retain Sutherland in the store " 'in the same capacity and profit sharing plan now in operation.' " Pappas was unable to collect the note.

Section 633.9, Code, 1958, provides: "No subscribing witness to a will can derive any benefit therefrom unless it be signed by two competent and disinterested persons as witnesses thereto, besides himself * * *." It is not claimed Mrs. Margias, who testified to execution of the will, was not a competent or disinterested witness.

The interest which disqualifies a witness must be of a definite and legal nature. The interest of Pappas and Sutherland here was remote, indirect and uncertain. The will conferred no legal right upon either. The nomination of Pappas as attorney for the estate was not binding upon the executrix nor the court in administering the estate. Any compensation Pappas might receive for collecting the note would presumably

be earned by him. The request to the beneficiaries Jennie and Alex that they retain Sutherland was merely precatory in nature. It was not obligatory upon the former nor enforceable by Sutherland.

See in support of the views just stated In re Estate of Rehard, 163 Iowa 310, 312, 313, 143 N.W. 1106, 1107; In re Will of Kenney, 213 Iowa 360, 364, 365, 239 N.W. 44, 78 A. L. R. 1189, and annotation, 1193; In re Estate of Farley, 237 Iowa 1069, 1080, 24 N.W.2d 453, 459; Re Estate of Lachmund, 179 Ore. 420, 170 P.2d 748, 166 A. L. R. 479, and annotation, 491; 94 C. J. S., Wills, section 185b and f, pages 998 to 1003; 57 Am. Jur., Wills, sections 314, 316, 323.

Further in support of the view that the request regarding Sutherland was precatory see In re Estate of Myers, 234 Iowa 502, 511, 12 N.W.2d 211, 215, 150 A. L. R. 254, 260; Luglan v. Lenning, 214 Iowa 439, 444, 239 N.W. 692; 95 C. J. S., Wills, section 602.

We have also held the apparent purpose of section 633.9, quoted above, is to disqualify as a beneficiary under the will one who acts as a witness to its execution, rather than to disqualify such a person as a witness. "The apparent purpose of this statute is to save the competency of a witness to a will even at the expense of the benefit which he might otherwise receive thereunder." In re Estate of Rehard, supra, 163 Iowa 310, 313, 143 N.W. 1106, 1107; In re Estate of Puckett, 240 Iowa 986, 991, 38 N.W.2d 593, 596. See also 57 Am. Jur., Wills, sections 327, 328.

Regarding the opinion testimony of plaintiff that William's signature is not on the will and of another witness that it does not seem to him the signature was William's, it is sufficient to say plaintiff's petition does not allege William did not sign the will. Further, this will was admitted to probate before the present action was commenced. (Some of our opinions refer to an action like this as one to set aside the probate of the will.) The three subscribing witnesses testify positively to having seen the testator sign the will. We have held the opinion even of a handwriting expert, standing alone, that the signature is not that of the testator is insufficient to generate

a jury question on due execution as against such positive, direct evidence. Buttman v. Christy, 197 Iowa 661, 670, 198 N.W. 314; Hoover v. Hoover, 238 Iowa 88, 94, 26 N.W.2d 98, 101.

IV. The court did not err in not compelling defendants to prove due execution of the will. The order admitting the will to probate was conclusive as to due execution until set aside by this action. Section 633.38, Code, 1958. The effect of this statute was to place the burden of proving lack of due execution upon plaintiff. Smith v. Ryan, 136 Iowa 335, 339, 112 N.W. 8; Convey v. Murphy, supra, 146 Iowa 154, 161, 124 N.W. 1073; Walters v. Heaton, 223 Iowa 405, 409, 271 N.W. 310; Hoover v. Hoover, supra, 238 Iowa 88, 90, 26 N.W.2d 98, 99. See also annotation, 76 A. L. R. 373, 383; 95 C. J. S., Wills, section 386, page 290; 57 Am. Jur., Wills, section 856. Perhaps we should add that plaintiff's petition copies the will in full and alleges it was admitted to probate. Defendants' answer admits the allegation.

V. Error is assigned to some rulings upon admission of evidence. The matters complained of are relatively unimportant upon this appeal. It is sufficient to say, in view of the conclusions heretofore stated, the rulings referred to must be deemed without prejudice.—Affirmed.

LARSON, C. J., and HAYS, THOMPSON, PETERSON, and THORNTON, JJ., concur.

GARRETT, J., dissents.

BLISS and OLIVER, JJ., not sitting.

GARRETT, J. (dissenting)—I respectfully dissent. An examination of the record discloses a considerable amount of definite and positive testimony sustaining the allegations of plaintiff's petition.

The majority opinion chooses to ignore this evidence and holds as a matter of law that it is not entitled to consideration by the jury. Plaintiff's testimony and that of his witnesses should not be disregarded and held for naught. We set out a part of the record.

Plaintiff testified:

"Q. Is this the signature of your brother that is contained on Exhibit '1.1'? A. No."

The date of the alleged will was March 13, 1958.

"Q. Mr. Drosos, describe what you saw when you saw your brother on the 11th day of March, 1958, describe him to the jury and the court, what he looked like? A. Is dead. Just exactly dead. Was like this, that's all. I touched his hand a little bit. He is dead."

The plaintiff took the hand of the deceased on the 11th day of March, 1958. He raised the hand.

"Q. And he acted like he was dead? A. He is dead. He is dead. Q. Did he respond to touching his hand in any way? A. I touched it. So his wife who was there, she said, don't bother him. He is gone. I told her, give him something to eat. Q. You said to Mrs. Jennie Drosos, give him something to eat? A. And she said, no. Nothing today. He didn't eat nothing today and yesterday neither.

"From the 11th of March, 1958, until the 19th day of March, 1958, the plaintiff saw the deceased once and sometimes two times a day. Sometimes in the evening. The plaintiff never heard the deceased utter a word from the 11th day of March, 1958, to the 19th day of March, 1958. He was in his room every day and there was no difference in his condition on the 13th day of March. Just a dead man. He saw him on the 14th day of March, and every day until the 19th. * * * During that time he never heard him say anything. * * * During this period of time there was no movement. The deceased never turned his head."

Mary J. Mehess testified:

"She saw the deceased seven days before the 19th of March, 1958. She stated that the deceased was in a state of paralysis. He couldn't speak. He couldn't look. She touched his hand, he was very cold. His eyes were very glassy and he just stared. She couldn't tell if he were looking at her or just looking into space. Mr. and Mrs. Prewitt and Mr. and Mrs. Drosos were in the room at that time."

Alex Kazos (restaurateur in Sioux City) testified:

"He saw the deceased March 12, 1958. (He was in the hospital) The witness did not talk to the deceased at that time. The reason he knew it was the 12th of March was because Harry Stetson was leaving for Greece, and Harry Stetson wanted the witness to take him up and bid the deceased goodbye.

"Q. Bill was dying when you were there, you knew that? A. If he was dying? Q. Yes. A. Yes. Q. Mr. Kazos, you stated Mrs. Drosos attempted to wake up the deceased when you and Mr. Stetson came in the room? A. Yes, sir. Q. What did she do? A. She called him. He couldn't even open his eyes."

Sophie Katsis testified along the same line. She visited the deceased on the 13th. He was very sick and could not say anything to her.

This court has, times without number, required the submission to the jury of cases based upon much less evidence. In Wiese v. Hoffman, 249 Iowa 416, 421, 86 N.W.2d 861, 865, we said: "In ruling upon motions for directed verdict the evidence must be considered in the light most favorable to plaintiff."

In Knaus Truck Lines v. Commercial Freight Lines, 238 Iowa 1356, 1360, 29 N.W.2d 204, 207, we said, through GARFIELD, J., "Of course, it is our duty to view the evidence in the light most favorable to plaintiffs and give them the benefit of all permissible inferences. When this is done, we think reasonable minds might reach different conclusions * * * and therefore it should have been submitted to the jury."

In Roller v. Independent Silo Co., 242 Iowa 1277, 1282, 49 N.W.2d 838, 841, this court said: "When different persons might draw different conclusions from the record a fact question is generated and it is the duty of the court to submit such matter to the jury."

This rule is so elementary that further citations of authorities is unnecessary.

I would reverse.