RUBY GATEWOOD et al., appellees, v. EDWIN I. COOPER, appellant.

No. 48510.

(Reported in 66 N.W.2d 472)

October 19, 1954.

William T. Connery, of Dubuque, and John D. Randall, of Cedar Rapids, for appellant.

O'Connor, Thomas, McDermott & Wright, of Dubuque, and Franken, Keyes & Crawford, of Cedar Rapids, for appellees.

BLISS, J.—About nine o'clock in the evening of June 27, 1952, plaintiffs, in their 1946 Ford, were traveling south out of Dubuque on Rockdale Road. It was a clear night and the road was dry. Mr. Gatewood, an experienced truck driver, was

driving, and his wife, Ruby, was sitting in the front seat with him. Going up a slight incline, the car with headlights on, traveling on the right or west lane of the highway, approached Grandview Avenue. There was a "SLOW" sign as they approached the intersection. The posted speed limit at the intersection was thirty-five miles, m.p.h. The speed of the car was reduced from twenty-five miles an hour to between fifteen and twenty miles. Gatewood was familiar with the highway and the intersection. The highway was twenty-four feet between the curbs north of the intersection, and forty-two feet wide south of it. Grandview Avenue was thirty-nine feet wide between curbs. At the southwest corner of the intersection was a combination grocery store and a Sinclair Oil Company service station. At the southeast corner was a service station and adjoining it on the south was a combination tavern and restaurant facing west on Rockdale Road, known as Buelow's Tavern.

That same evening the defendant and Mrs. Cooper and the latter's sister, Elizabeth Pfeiffer, and her husband-to-be, Fred Pratt, were riding in the Cooper 1938 Dodge sedan to the house of Dr. Clarence A. Darrow, which was on Grandview Avenue about four blocks west of the intersection above-mentioned. Their purpose in calling on Doctor Darrow was to arrange for a blood test for Elizabeth and Fred, preliminary to their marriage. It was a little early for their appointment, and about 8:30 p. m. the group stopped at Buelow's Tavern for refreshments, where they remained until about nine o'clock. The defendant had parked the car at the tavern parking place east of Rockdale Road, and after all were in the car he backed it west and south, to about 100 feet south of the south intersection line, and proceeded north toward the intersection in the right or east lane of Rockdale Road, traveling in low gear, at a speed of about 12 m.p.h., with his left arm, according to his testimony, extended throughout the distance for a left or west turn. When he was about forty feet from the intersection he saw headlights to the north. They were the headlights of plaintiffs' car. Defendant testified:

"I could not tell how far down the hill they were at that time. I came onto the intersection and made a full left-hand

turn, and at that time I looked again toward Dubuque and saw the lights about 200 feet or a little more away. At that time I estimated that the other car was doing about forty to forty-five miles an hour. At that time I figured that distance away I could make the turn. After I made that observation I proceeded to go right on and make my turn. I didn't stop. I took my left hand in and took hold of the wheel and I saw him so far down the highway that I just made my left-hand turn. I turned far enough around with respect to the car that was stopped at or about the west stop sign on Grandview Avenue to go around him directly west. That was when I got struck by the Gatewood car."

The "Findings of Fact" by the district court were not in accord with defendant's version of the collision. The court said:

"As plaintiffs' car approached the intersection of said Rockdale Road with Grandview Avenue, it was being operated at a reasonable and proper rate of speed, which speed was reduced as the car neared the intersection. At said time and place, the defendant, Edwin I. Cooper, was driving his car in a northerly direction on Rockdale Road toward the intersection with Grandview Avenue, with his wife and two other persons as passengers. As it reached the intersection, the defendant turned his car to the left into Grandview Avenue and cut the corner so as to place said automobile directly in the path of plaintiffs' automobile approaching from the opposite direction. The headlights on both cars were lighted, and as defendant proceeded to make said left turn the position of plaintiffs' oncoming car which was proceeding to enter the intersection was such as to constitute an immediate hazard, which would be apparent to defendant if he was maintaining a proper lookout. The front end of plaintiffs' car struck the right side of the defendant's car, said collision taking place in the southwest portion of said intersection and causing damage to both cars. The proximate cause of said collision was the negligence of the defendant in the following respects:

"1. In turning his vehicle from a direct course on said highway directly in front of plaintiffs' automobile.

"2. In failing to yield the right of way to plaintiffs' automobile which was approaching from an opposite direction within the intersection or so close thereto as to constitute an immediate hazard.

"3. In failing to maintain a proper lookout for vehicles approaching from the opposite direction including plaintiffs' vehicle.

"Plaintiffs * * * were both free from any negligence contributing to the happening of said collision. * * *."

The court commented on the severe and painful injuries received by Ruby Gatewood. It was stipulated that the reasonable cost of repairs to plaintiffs' car was $377.72.

The fact findings and the judgment of the trial court are preponderantly sustained by the evidence. Mr. Gatewood testified that: as he approached the intersection the amber light was on for north-and-south traffic, and the red light was on against east-and-west traffic; he slowed up for the intersection and saw no cars either to the right or left of the intersection; he was about ten feet north of the intersection when he first saw defendant's car about ninety feet to the south approaching the intersection in its proper lane—the east lane of Rockdale Road; he [Gatewood] proceeded through and was over halfway through the intersection, and defendant made a left turn directly in front of him; the intersection is divided into equal quarters. Continuing, the witness testified:

"I would state that the front end of my car was in the northwest section or quadrant when I first saw him [Cooper] make his turn. The front end of the Cooper car wasn't quite in the intersection when it started to make its left turn, yet it was on its own side of the road. When the Cooper car started to make the turn the front end would be just south of the south line of the intersection. The Cooper car was on the east half of the Rockdale Road when it started to make its left-hand turn. He had been on his side of the road just as he started to turn. He turned just before he came into the intersection and he had cut the corner in such a way if there had been a car waiting to enter Rockdale Road from the west of him on

Grandview Avenue he would have collided with it. I would say the Cooper car was traveling at a moderate speed. * * * The two cars came together in the southwest quarter of the intersection. I had time to apply my brakes before the collision occurred. I did not observe any signal given by the driver of the Cooper car for a left-hand turn before the turn was made. I was watching the car and watching the road. The only car I saw was his car coming toward me. I couldn't say how far my car traveled after the collision. I don't think it traveled any further when I hit him."

On cross-examination Gatewood testified: "Immediately when I saw Mr. Cooper turn I applied my brakes. At that time I was in the northwest quarter of the intersection. At the time I applied my brakes I would say that the full fifteen feet in length of my car was in the northwest quarter of the intersection. My brakes took hold. * * * When I was over halfway through the intersection, suddenly Mr. Cooper's car turned directly in front of me. It was at an angle, cutting the corner. When I say cutting the corner I would say that Mr. Cooper was going in a northwesterly direction. Mr. Cooper started to make the turn to the left before he was in the intersection, that is just where it would come to the curb line. Mr. Cooper's car cut the southwesterly quarter of the intersection."

Mrs. Gatewood was enjoying the evening ride and not giving much attention to the traffic. She testified: "We were traveling south on Rockdale Road and as we came to the intersection, we noticed headlights of another car on the other side of Grandview Avenue and it seemed like in just the very next instant I saw the car right in front of us and the accident occurred, and we hit the other car on that side and I hit my knees on the dash and my head on the windshield, knocked me I'd say 'semi-unconscious.' I shattered the windshield with my head and bulged it out and of course I caused cuts on my eyelid and forehead and took off at least half of my eyebrow. My knees were injured quite seriously and the left one was cut and bleeding and my face was bleeding quite badly when I came around." She was taken from the car to the hospital.

Glen Sullivan had been following the plaintiffs' car for some time before reaching the intersection. A friend was seated with him in the front seat of the car. They had been driving at a speed of 25 m.p.h. and had kept a few car lengths back of the Gatewood car until it slowed down for the Grandview Avenue crossing and they caught up with it. Both were witnesses for the plaintiffs. Mr. Sullivan testified that he saw the Cooper car as it reached the south line of the intersection on its own side of the road until it suddenly made a quick turn to the left: "I saw the Gatewood car and the Cooper car collide, the collision occurred in the southwest corner of the intersection. The front of the Gatewood car was south of the center line of Grandview Avenue when it struck the Cooper car. The front end of the Cooper car was west of the center of Rockdale Road when it was struck. I observed the Cooper car approach the intersection and I did not see the driver give any signal of any kind. I was looking southerly on the highway toward the Cooper car. The Gatewood car came to rest after the collision in the southwest quarter about ten feet south of the center line of Grandview Avenue. The front end of the Gatewood car was in that position. The Cooper car came to rest in the southwest quarter at an angle facing west. * * * At the time of the collision I had to pull to the left to avoid hitting the Gatewood car. I caught up with him quite a bit. I heard something screeching before the collision, but that's about all and I couldn't tell whether Gatewood slid the tires or not. I did not go around to look for any skid marks."

Mike Manos, the passenger in the car of Sullivan, corroborated the latter's testimony. He testified: "It was kind of hard to say which side of the highway the Cooper car was traveling because when I saw it, it was turning onto Grandview and he cut the corner sharp there. * * * When I first saw the driver of the Cooper car start to turn to his left, it wasn't in the intersection; * * * I didn't observe the driver of the Cooper car give any signal of any kind; the two cars collided in the southwest quarter of the intersection. The front end of the Gatewood car was south of the center of Grandview Avenue when it collided with the Cooper car. The car in which I was

riding was approximately a car length or something like that behind the Gatewood car as Gatewood entered the intersection."

Paul Zimmerman and Donald Lehnertz, members of the Dubuque Police Department, received a report of the collision at approximately 9:05 p. m., and promptly went to its location. They first called an ambulance for the injured. Mr. Zimmerman was a witness for the plaintiffs. Neither car had been moved when he and Mr. Lehnertz arrived. The rear end of the Cooper car was in the extreme southwest corner of the southwest quarter of the intersection, and almost against a stop sign just beyond the corner and facing west for eastbound traffic on Grandview Avenue. The Cooper car was headed somewhat to the northwest with part of it still on the Rockdale Road within the southwest quarter of the intersection.

Mr. Zimmerman testified: "We took measurements from the west curb line of the intersection to the right front wheel of the Gatewood vehicle and it was ten feet. From the right front wheel to the south curb line was fifteen feet. From the left front wheel to the center of the street was five feet. We established the point of impact between the two vehicles to be directly in front of the Gatewood vehicle. By the right front of the Gatewood vehicle we figured the point of impact was ten feet east of the west curb line and fifteen feet north of the south curb line and five feet south of the center of Grandview Avenue. The collision occurred in the southwest quadrant of the intersection. * * * From the point of impact, as I established it, the turn was made south of the center of Grandview Avenue. We observed skid marks at the scene of the accident behind the Gatewood vehicle. There were some heavy black skid marks in front of each wheel and went to the rear of the vehicle. They started from the front and extended way back to the rear of the Gatewood vehicle and they were one continuous line. * * *

"The debris that I found in the southwest quadrant of the intersection identifying the point of impact was considerable dirt, glass and a piece of chrome. All of the debris was scattered over an area of three or four feet in front of the Gatewood car. We found two eyewitnesses to the accident, Glen

Sullivan and Mike Manos. We could find no other eyewitnesses."
Pictures taken that night while the policemen were there con-
firm the testimony of Policeman Zimmerman as to the location
of the cars after the collision.

The testimony of Mrs. Cooper was corroborative of her
husband's testimony. She said that after her husband backed
his car from the tavern parking place and started north he
stuck his left hand out of the window for a left-hand turn. As
she was about to get in the ambulance after the collision she
said she glanced back and could see their car against the stop
sign on the west side of the corner. She testified that she
looked straight ahead at all times after leaving the tavern
except when her husband stuck his hand out to make a left-
hand turn. The following questions and answers are in her
testimony:

"Q. And when was that done? A. When he went to make
a left-hand turn he stuck his hand out of the window.

"Q. Where was your car at that time? A. At that time it
was out in the middle of the intersection making the left-hand
turn."

Mrs. Fred Pratt, who was in the back seat of defendant's
car with her husband, was a witness for defendant. She testified
that the first time she saw the defendant give a signal for a
left turn was when he started to turn, "and then just as Ed,
Mr. Cooper, made his hand signal, my boy-friend gave me a
shove and I went on the floor. The crash happened right after
my boy-friend pushed me on the floor. That is the first time I
saw him give a signal."

Mr. Pratt, testifying for defendant, said that the latter
gave a left-turn signal as "we proceeded down the road." On
cross-examination he said: "I was visiting with the people in
the car. You couldn't prove it by me whether or not Mr. Cooper
kept his hand out the window the whole time until he got hit.
I don't know. As far as I know he could have put his hand
out and pulled it right back in. * * * I don't know where the
Cooper car was when he started to make his left-hand turn. * * *
After we left the tavern we backed up and turned on the high-
way and drove in a general *northwesterly* direction."

The location of defendant's car in the southwest corner of the intersection is confirmed by Mr. Cooper's testimony, to wit: "The left rear of my car was up against the stop sign that sits back about four feet from the curb, and the right wheel extended over into the street about two feet and that highway across there is forty-two feet. The left side of the back of my car was against the stop sign and was up over the curb * * * and my right was not. * * * Three or four feet of my car was over the curb on the grass on the southwest corner of the intersection. * * * The front end of my car was about five feet past the curb line, maybe a little bit more, when I started my left-hand turn. It might have been ten feet north of the south curb line. I would say the front end of my car was about that." Grandview Avenue extends east and was thirty-nine feet wide between its north and south curb lines, so that, according to the defendant's testimony, his car was well south of the center of the intersection and its east and west center line when he made his left turn.

Defendant rested his case with his testimony. He had previously put on the witness stand an acquaintance of his who was in Buelow's Tavern when the Cooper party was there. He came out when he heard the collision. He testified that the Cooper car "was right by a stop sign."

Another acquaintance of defendant testified for him. He had driven south on Rockdale Road, on which plaintiffs had preceded him, and reached the intersection with Grandview Avenue a few minutes after the collision. He turned to his right and west into the Avenue. He testified that both cars were in the southwest quarter, and, "They were far enough south so that I could turn to my right without any difficulty. * * * The left side of the Cooper car would be closest to the stop sign. * * * The stop sign was against the left back wheel of the Cooper car."

Plaintiffs called Joseph F. Rand in rebuttal. He was driving west on Grandview Avenue and stopped just east of the intersection for the red light, as the cars of plaintiffs and defendant approached the intersection. Two cars going west stopped ahead of him. He testified that plaintiffs' car was

about forty or fifty feet north of the intersection when he first saw it and its speed was twenty to twenty-five miles an hour, and that defendant's car was going between eight and fifteen miles an hour. He said that he could not see defendant's car as it left Buelow's, "but I could see that he straightened out and went down Rockdale Road straight and then turned left. I would say that he went more diagonally from Buelow's across to turn left onto Grandview Avenue. The two cars came together in approximately the southwest quarter of the intersection."

At the close of the evidence, defendant moved to dismiss and to direct a verdict for defendant on the grounds that plaintiffs had failed to prove any actionable negligence of defendant, and freedom from contributory negligence on their part, and moved to withdraw from the consideration of the court the claim of Ruby Gatewood for permanent injuries.

The motions of defendant were denied by the court in its Findings of Fact, hereinbefore set out, wherein the court found defendant was negligent as alleged, and that plaintiffs were not contributorily negligent. With respect to the damages prayed for by Ruby Gatewood for personal injuries in the sum of $5101.80 and for repairs to plaintiffs' car for $377.72, the court found that: when the cars collided Ruby Gatewood was thrown forward with such force against the windshield and dashboard of the car that the windshield was broken by the impact of her head, and she received severe and painful injuries including lacerations of her forehead and right eyelid with imbedded particles of glass, the cutting off of her right eyebrow, and serious injuries to her knees; she was dazed and semiconscious, bleeding from the face, and her left knee was cut and bleeding; she was taken to a hospital at Dubuque where X rays were taken and given first-aid treatments; she proceeded to her home in Cedar Rapids and continued under the care of a physician for her injuries; her most serious injury was to her knees which caused her severe pain, suffering and sleeplessness for approximately a month and continued to cause her pain and discomfort at the time of the trial (August 3, 1953) ; the testimony of a physician who examined her (April

22, 1953) was that she would experience some discomfort and be aware of the fact that her knees were not normal and would not be for a period of approximately two years from the date of the collision, and that her susceptibility to pain as a result of bumps, jars or pressure on her knees would remain for approximately the same period; no medical testimony was offered by defendant to contradict the testimony of the physician or of Ruby Gatewood with respect to her injuries or their effects, nor did defendant cross-examine her with respect to these matters; her medical and hospital expense was of the reasonable value of $99.80; for her injuries, pain and suffering she should be awarded $2000, making her total award $2099.80; the only other award to plaintiffs was $377.72, the stipulated reasonable cost of repairing plaintiffs' car. Judgment for plaintiffs was rendered in accord with the findings.

Defendant bases his right to a reversal of the judgment of the trial court on the following assigned errors: 1. The overruling of his motion to dismiss the action. 2. The ruling that plaintiffs sustained the burden of proving their freedom from contributory negligence. 3. The ruling that defendant was negligent. 4. The awarding of excessive damages to Ruby Gatewood in the sum of $2000 for the injuries she received and the pain, suffering and discomfort consequent thereon.

█ We find no merit in any or all of the errors assigned and no prejudice to defendant justifying a reversal. The evidence as we have stated it and as it appears in the record speaks most convincingly of the rightness of the district court in denying the motions of the defendant. It fully sustains those rulings. All witnesses for plaintiffs who testified to matters relating to the collision were disinterested. The physical facts and the location of the cars after the collision confirmed their testimony and that of plaintiffs, and sustained the finding of the court that defendant, negligent in three respects, cut across the southwest corner and quarter of the intersection directly in the path of plaintiffs' car, when the front of the latter was past the east and west center line of the intersection.

Mrs. Gatewood was very fortunate in not receiving much

more serious injuries because of the extreme negligence of defendant. By the sudden and forceful application of the brakes of her car and the impact with defendant's car, her head struck the windshield with such force as to break it and splinter the glass, and both knees struck the dashboard. The immediate shock and pain were severe. She had constant pain and much aching and discomfort for some weeks, which gradually eased off, but were followed by sharp intermittent pains for several months. Mrs. Gatewood was twenty-four years old at the time of the trial. Both she and her husband were employed. In addition to her household duties she was employed as cashier, bookkeeper and typist for a transfer and storage company in Cedar Rapids. She was so employed at the time of her injury. This injury was on Friday night and she returned to her office duties on the following Monday. Defendant stresses this fact as evidence of the inconsequence of her injuries. Of this she testified:

"I worked both at my job and work and my housework under I'd say extreme discomfort and as a matter of necessity rather than desire to do it at least for some time after the accident, both to go to work and to do my housework. * * * We have two different offices. I work back and forth in both offices, which, as far as the physical aspects, would be walking and of course getting down in filing cupboards and so forth. I suffered a lot of pain in both knees. It was very painful to go upstairs, even two or three steps were painful. My extreme discomfort remained about three weeks or a month. The condition of my knees limited my movement in almost anything I tried to do that took leg work. * * * The injuries in my knees have bothered me at night. Sometimes I have quite a lot of trouble getting to sleep and even wake up with them. The first month following the accident my knees ached constantly and at night when I laid down it seemed like it was worse * * * and it was that way every night. Of course it has improved, but I am still in trouble once in a while. Since the date of the accident I have received bumps to my knees. I naturally bump the desk once in a while, maybe a chair or something. They are still very tender and sometimes hurt for a matter of

days after that. If I happen to bump them just right they are extremely painful. That condition still remains. I notice a stiffness and pain if my knees remain in one position for any length of time, until I get them flexible again."

A specialist in orthopedics made a thorough examination of her knees on April 22, 1953. He made a diagnosis and positive findings of traumatic chondritis, or injury to and inflammation of the cartilages underlying the kneecaps of both knees and covering the femoral condyles of each knee joint. The knees were painful to palpation and pressure. It was his opinion that she sustained considerable injury and damage at the time of the accident to the cartilages of the patellae and the femoral bone, which rub against each other on motion of the knees, which "is further verified by the fact that she still had, after a period of approximately nine months, positive or objective findings in both knees. * * * It is characteristic in this type of injury that when patients sit in a particular position, such as in a theater or when driving a car, the leg having been quiet will begin to ache because its position has not been varied." He gave it as his opinion that the disability to her knees would continue for approximately two years from the date of the accident.

It is our conclusion that the court's award to Mrs. Gatewood of $2000 for her personal injuries and for the pain, suffering and disability resulting therefrom does not exceed reasonable compensation, and the judgment therefor should not be disturbed.

I. This court has many times held that in a law action submitted to the court below sitting as a trier of the facts, its findings have the force and effect of a jury verdict, and the judgment rendered and entered thereon will not be interfered with by this court if there is substantial support in the record. Ruble v. Carr, 244 Iowa 990, 992, 993, 59 N.W.2d 228, 230; Cleary v. Wolin, 244 Iowa 956, 957, 58 N.W.2d 830; Weidert v. Monahan Post Legionnaire Club, Inc., 243 Iowa 643, 652, 51 N.W.2d 400; Dahl v. Allen, 243 Iowa 808, 813, 53 N.W.2d 759; Brown v. Compton & Roush, Inc., 243 Iowa 665, 671, 53 N.W.2d 164; Carlson v. Bankers Trust Co., 242 Iowa 1207,

1214, 1215, 50 N.W.2d 1; Finkle v. Finkle, 239 Iowa 783, 786, 32 N.W.2d 807; Davis v. Knight, 239 Iowa 1338, 1339, 1340, 1352, 35 N.W.2d 23; rule 334 of Iowa Rules of Civil Procedure; In re Estate of Puckett, 240 Iowa 986, 1000, 1001, 38 N.W.2d 593; Miller v. King, 240 Iowa 1336, 1338, 39 N.W.2d 307; Hull-Dobbs Motor Co. v. Associates Discount Corp., 241 Iowa 1365, 1367, 1368, 44 N.W.2d 403.

■ II. It was for the court as trier of the facts to measure in money the award to Mrs. Gatewood as best it could. Damages such as she sustained are not capable of mathematical computation. Whether the award be made by a court or by a jury, the determination of the amount of the recompense for physical suffering and disability and mental anxiety must be left largely to a wise and well-guarded discretion, and ought not be disturbed on appeal unless it is so flagrantly out of reason and justice as to convince the court of its being the result of passion, prejudice or other improper influence. Russ v. The Steamboat War Eagle, 14 Iowa 363, 371, 372; McWilliams v. Ebling, 240 Iowa 174, 179, 35 N.W.2d 768; Boslough v. Panagakis, Iowa, 280 N.W. 486; Elings v. Ted McGrevey, Inc., 243 Iowa 815, 820-822, 53 N.W.2d 882.

The judgment is—Affirmed.

All JUSTICES concur except SMITH, J., who takes no part.