Wilmer Wiese, as administrator of estate of LaGene Crampton, deceased, appellee, v. Peter Hoffman, defendant, and Kenneth Walters et al., appellants.

No. 49339.

(Reported in 86 N.W.2d 861)

418

December 17, 1957.

L. V. Gilchrist, of Denison, for appellants.

Edward S. White, of Carroll, for appellee.

PETERSON, J.—LaGene Crampton, a seventeen-year-old high-school junior, lived with her parents in Vail. On March 17, 1955, she had a date with Raphael F. Hoffman, a young man eighteen years of age, to go to a dance at Carroll that evening. They made arrangements with another young couple, Dewayne McCullough and Carol Bauer, to accompany them. Raphael came to the Crampton home about 7:30 to get LaGene, driving his father's Mercury car. The car was driven with the consent of his father, Peter Hoffman, defendant. Dewayne and Carol were already in the back seat. They drove east toward Carroll on highway 30. The road was icy.

When they were about six miles west of Carroll, Raphael saw another car in front of him, also proceeding east. This car was driven by Earl Stribe. As they were about to drive up a hill Raphael noticed Mr. Stribe signaling for a left turn. Raphael quickly applied his brakes, and because of the icy condition of the road his car suddenly veered to the north and stopped across the north lane of travel. Shortly thereafter, Kenneth Walters, driving west, came over the crest of a hill approximately three

hundred feet away. He was driving the Ford car of his father, William Walters. He struck the right side of the Hoffman car, near the center, with such force that his left front wheel ran into the front seat of the car where LaGene was seated. She was thrown across the seat and partly out of the door on the other side of the car, and was killed instantly. Raphael was dazed to the extent that he was never able to remember what happened after the car swung around to the north.

William Wiese, LaGene's uncle, was appointed administrator of her estate, on her mother's petition. This action was started against Peter Hoffman' as the owner of the Mercury car, Kenneth Walters as driver of the Ford car, and William Walters as owner. At the close of the testimony, on motion for directed verdict, the trial court dismissed the case as to Peter Hoffman. No appeal was taken by plaintiff as to this dismissal. Defendants Kenneth and William Walters filed motion to direct verdict at the close of plaintiff's testimony and also at the close of all testimony. These motions were overruled. The jury returned a verdict for plaintiff in the amount of $10,000. Defendants Kenneth and William Walters filed motion for judgment notwithstanding the verdict, and for new trial, both of which were overruled. They have appealed.

While appellants assign twenty-one alleged errors, they can all be considered under three general statements. 1. Evidence as to negligence was not sufficient to justify submission to the jury. 2. There was not sufficient evidence to sustain the verdict. 3. The jury was guilty of such misconduct that the trial court should have granted a new trial.

I. Plaintiff in substance alleged as grounds of negligence: Failure to maintain proper lookout; failure to have car under control and to reduce speed to safe and proper rate when approaching crest of hill on icy pavement; driving car at speed greater than would permit defendant to stop within assured clear distance.

There were only two eyewitnesses who testified. Carol Bauer for plaintiff and Kenneth Walters, defendant. There were three other witnesses for plaintiff, and four for defendants as to the accident, but they arrived after the collision, and their testimony is only circumstantial.

After preliminary testimony with reference to the four young people starting on their trip, Carol Bauer testified that after driving east a few miles there was a car close ahead which turned on its blinkers for a left turn. Hoffman put on the brakes and his car swerved and faced north, blocking the north half of the pavement. She then said: "As soon as the car came to a stop I looked toward the east and I didn't see anything coming, and then I looked back toward the north, and I looked back toward the east and saw these headlights, they looked like they were real small, like they were far away. LaGene said 'Look out,' that's when the car hit us, on the front right-hand side."

Kenneth Walters testified: "As I came west up the last hill I was driving about 35 to 40. The paving was very slippery. By that I mean it was icy. * * * After I passed the Stribe car, all at once this other car just dodged right directly in my path. When I first saw it it was moving and I was right there on the spot, see. Just as soon as I met this Stribe car, I no more than got past it and this car was in my path. I don't recall what I did—don't know whether I put on my brakes or not. When I first saw it I don't think it was ten feet from the front of my car. It was immediately in front of me. There was absolutely nothing I could do to avoid it. I don't know whether I put on the brakes. I was badly injured."

The following witnesses testified on behalf of plaintiff. John Mahnke, a member of Iowa Highway Patrol, arrived at the scene a short time after the accident. He stated it was misting, and the road was icy. Neither the cars nor the body of LaGene had been moved. He identified the exhibit showing how the Walters' car crashed into the right side of the Hoffman car. He said the distance from the west end of the yellow line on the east side of the hill to the point of accident was 327 feet. There was a 57-foot break between the end of the yellow line and the top of the hill, which meant the distance from the crest of the hill to the point of accident was 270 feet. Walters was alone in his car. Mahnke opened the door, and detected a strong odor of beer. Leonard Hinze, deputy sheriff, arrived at the scene shortly after the accident. He also said the highway was icy. He identified several exhibits showing the location of the cars. Norman Piper was

driving east on highway 30. He had three other boys with him in his car. He saw two headlights and thought it was a car coming, but then saw it was stopped and that it was an accident. "I applied my brakes. I noticed then it was icy." The cars had not been moved and he described the position of the cars. He testified: "I opened the Walters' door—I don't remember whether it was opened or if I opened it—but anyway I did smell beer. That I'll say in that car. Walters was sitting in the car. He was the only one in the car."

The following witnesses testified on behalf of defendants. Richard W. Stebbins said he was one of the boys in the Piper car. His testimony was the same as that of Norman Piper, except he did not go to the Walters' car door. Mr. and Mrs. Earl Stribe were driving their car toward the east, and as they were approaching the Nohlts farm near the bottom of the hill they signaled a left turn. They were going to stop to pick up Mrs. Nohlts. They testified about meeting a car coming down the hill, traveling probably forty miles per hour or maybe a little less. The headlights were dimmed. Immediately after they passed the car they heard a crash. Mr. Stribe thought the car sideswiped his car. He stopped on top of the hill, and looking back, saw the wreck at the bottom of the hill. Mrs. Stribe said: "I heard the crash. It was soon after our cars were abreast. * * * When we got out of the car it was icy, because we had to take hold of hands to cross the paving. * * * I do remember seeing this other car come over the hill from the east going west, and shortly after it passed us there was a crash." Robert Sundrup, one of the boys in the Piper car, stated: "I walked up to the accident. As I walked up there I walked on the pavement and it was icy." Dr. Roland B. Morrison stated Kenneth Walters was his patient, and he treated him at the hospital when brought in immediately after the accident. He gave him a blood test as to intoxication and according to the test Walters was not intoxicated.

In ruling upon motions for directed verdict the evidence must be considered in the light most favorable to plaintiff. We have said this in numerous cases. Knaus Truck Lines, Inc. v. Commercial Freight Lines, 238 Iowa 1356, 29 N.W.2d 204; Lawson v. Fordyce, 234 Iowa 632, 12 N.W.2d 301; In re Estate of Ransom, 244 Iowa 343, 57 N.W.2d 89.

All allegations of plaintiff as to negligence, except lookout, are based on chapter 321, 1954 Code (Motor Vehicles and Law of Road). Section 321.285, provides: "Any person driving a motor vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead, such driver having the right to assume, however, that all persons using said highway will observe the law." Pertinent parts of section 321.288 are: "The person operating a motor vehicle * * * shall have the same under control and shall reduce the speed to a reasonable and proper rate: 3. * * * when approaching * * * a steep descent, in a public highway."

█ Lookout is based on common-law and judicial precedent. The testimony in this case is such that the question of proper lookout by defendant was for the jury. Kenneth Walters came over the crest of the hill 270 feet from the place where the Hoffman car was stalled across the roadway. The jury could find the car was stalled before he reached the crest of the hill, because of Carol Bauer's testimony. She saw no car when she first looked east. In connection with approaching the crest of the hill and descending therefrom, Walters testified: "I say that when I came over the top of the hill I was going about 35 possibly 40 miles an hour. I had dimmed my headlights. The windshield was clear so I could see real well. * * * I'd say that Mr. Stribe's car was about half way up the nearest hill in Exhibit 1." (This is the hill involved in the case.) This means the Hoffman car was about 135 feet away when Walters passed the Stribe car. The jury could have found as to proper lookout on the part of Walters that he should have turned on his bright lights immediately after passing the Stribe car. If he had done this, he certainly would have seen the Hoffman car long before the ten-foot distance as testified by him.

We have considered the question of proper lookout and defined it in many cases, including several recent decisions. Pazen v. Des Moines Transp. Co., 223 Iowa 23, 30, 272 N.W. 126, 130; Ehrhardt v. Ruan Transport Corp., 245 Iowa 193, 61

N.W.2d 696; Jesse v. Wemer & Wemer Co., 248 Iowa 1002, 1013, 82 N.W.2d 82, 87; Mueller v. Roben, 248 Iowa 699, 82 N.W.2d 98; Cunningham v. Court, 248 Iowa 654, 82 N.W.2d 292; Mongar v. Barnard, 248 Iowa 899, 82 N.W.2d 765.

In Pazen v. Des Moines Transp. Co., supra, we stated: "The term 'proper lookout' means more than to look straight ahead, or more than seeing the object. It implies being watchful of the movements of his own vehicle as well as the movements of the thing seen. It involves the care, prudence, watchfulness, and attention of an ordinarily careful and prudent person under the circumstances."

Statements in Jesse v. Wemer & Wemer Co., supra, have significance as to the facts in this case. We said: "Of course, maintenance of a proper lookout means doing something more than mere looking, i.e., the acts required by a diligent person exercising due care when the lookout discloses or reasonably should disclose to the driver circumstances fraught with danger." Defendant was approaching the crest of a hill on an icy highway. This was fraught with danger and required keen lookout. We have held the question of proper lookout is for the jury in cases somewhat similar to the case at bar. Rogers v. Jefferson, 226 Iowa 1047, 285 N.W. 701; Fischer v. Steinhauer, 233 Iowa 777, 781, 10 N.W.2d 649, 651. In Fischer v. Steinhauer, supra, we stated: "In this case the evidence upon the question of appellant's failure to keep a lookout was in conflict. It was for the jury to determine whether or not he was guilty of negligence in that connection."

The questions of control of his car, whether Kenneth was driving at a careful and prudent speed when approaching the crest of the hill on an icy highway, and whether his speed was greater than would permit him to bring his car to a stop within the assured clear distance ahead, were for the jury. We defined the meeting of assured clear distance in Lindquist v. Thierman, 216 Iowa 170, 178, 248 N.W. 504, 508, 87 A. L. R. 893: "Consequently, it is evident that the words 'within the assured clear distance ahead', as used in the statute, signify that the operator of the automobile, when driving at night as well as in the day, shall at all times be able to stop his car within the distance that discernible objects may be seen ahead of it." The

statutory obligation of defendant to have control of his car so he could stop within assured clear distance rested more heavily upon him because of the hill and icy roadway. If defendant, acting prudently, should have seen the object ahead, the question of "assured clear distance" becomes one for the jury. Anderson v. Kist, 229 Iowa 462, 294 N.W. 726; Central States Electric Co. v. McVay, 232 Iowa 469, 5 N.W.2d 817; Tuhn v. Clark, 241 Iowa 441, 41 N.W.2d 13, 15 A. L. R.2d 903.

Whether a car can be considered under control depends on the circumstances of each case. Some language used, and cases cited, in Arenson v. Butterworth, 243 Iowa 880, 887, 54 N.W.2d 557, 561, are applicable in this case: "* * * an automobile is under control if it is moving at such a rate and the driver has the mechanism and power under such control that it can be brought to a stop with a reasonable degree of celerity. This accords with frequent pronouncements by us. See Lynes v. Schmolt, 241 Iowa 1303, 1306, 45 N.W.2d 221, 222, and citations; Clayton v. McIlrath, 241 Iowa 1162, 1169, 44 N.W.2d 741, 745. * * * We have frequently pointed out that the question of control of a motor vehicle largely depends upon the surrounding circumstances of each case and is ordinarily for the jury. See Rogers v. Jefferson, 226 Iowa 1047, 1051, 285 N.W. 701, and citations; Dorman v. Service Sales Co., supra, 241 Iowa 1182, 1184, 44 N.W.2d 716, 717."

The burden of proof rested with plaintiff, and the trial court properly and carefully so instructed. Co-operative Sales Co. v. Van der Beek, 219 Iowa 974, 259 N.W. 586; Griffin v. Stuart, 222 Iowa 815, 270 N.W. 442.

As to the actual occurrence there is one witness for plaintiff, and one for defendant. The verdict of the jury is not dependent on the number of witnesses. The weight of the testimony is the important factor. 32 C. J. S., Evidence, section 1022; Heald v. Western Union Telegraph Co., 129 Iowa 326, 105 N.W. 588; Garretson v. Harlan, 218 Iowa 1049, 256 N.W. 749. The jury has a right to consider many elements in arriving at the right answer as between the parties. It may consider the frankness, or lack thereof, and general demeanor of witnesses, and the plausibility of the evidence. The jury may use its good judgment as to the details of the occurrence, including the posi-

tion of the cars, the condition of the highway, the presence of the hill in this case, and all proper and reasonable deductions to be drawn from the evidence.

32 C. J. S., Evidence, section 1022(b), page 1055, states: "Evidence on an issue of fact is not necessarily in equilibrium because the witnesses who testify to the existence of the fact are directly contradicted by the same number of witnesses, even though there is but a single witness on each side and their testimony is in direct conflict. * * *"

Subparagraph (c), page 1056, states: "Numerical preponderance of witnesses does not necessarily constitute a preponderance of evidence so as to require a contested question of fact to be decided in accordance therewith * * * the intelligence, fairness, and means of observation of the witnesses, and various other recognized factors in determining the weight of evidence * * * should be taken into consideration." In Garretson v. Harlan, supra, this court said at page 1058 of 218 Iowa: "It is, of course, well recognized that the preponderance of the evidence does not depend upon the number of witnesses."

II. Appellants contend vigorously that since decedent was a seventeen-year-old girl, still in school, there was no damage to her estate. They state if the jury should hold defendant Kenneth Walters guilty of negligence, only nominal damages should be allowed. Assuming negligence, and death therefrom, we are confronted with the question of considering allowance to the estate of a teenage high-school student. Can we properly say that under such circumstances there is no basis for a substantial verdict? Considering all available factors the answer rests in the good judgment of a jury, assuming no passion and prejudice, and finally subject to consideration by the court as to amount. The available factors are not numerous: life expectancy; health of the child; intelligence; alertness; general characteristics; progress in school; expressed plans for the future, and extra curricular activities.

In connection with damages for death of a child of immature years or a teenager, 16 Am. Jur., Death, section 216, states: "* * * the prospective ability of the decedent has been held properly to be taken into consideration in the case of the death of a young child * * *. The same result has been reached in regard

to the possibility of an increase in the child's wages, at least in the case of a child intelligent and apt in learning. In line with these decisions, it has been held that an award of substantial damages is not necessarily precluded by the fact that the decedent was a child of tender years at the time of his injury and death. In the case of the wrongful death of a child old enough to have established a character, elements properly considered in assessing the pecuniary loss sustained may consist of his characteristics, including his habits of industry, sobriety, kindliness, tractability, and obedience."

The evidence presented by plaintiff in this case with reference to LaGene was the best available in view of her age and the fact that she was still a schoolgirl. It was agreed, and submitted by the court in the instructions, that according to standard mortality table her life expectancy was 49.21 years. Her uncle, Mr. Wiese, administrator of her estate, testified: "Her health was very good * * * she was a well-behaved girl, well thought of, good mannered, had been active in school affairs." Her mother, Mrs. Ila Crampton, testified: "She was a wonderful student in school, above average. She engaged in activities as a cheerleader, basketball, music, and outside activities. She was in 4-H and had been in there from the time her age permitted. She was engaged to no one. She and her father and I had plans for her future. We had plans for all our girls. Our oldest daughter went into nursing training; * * * and LaGene, many a time she put on that cap of Colleen's thinking maybe she could go into nursing training or either she wanted to go in secretary work. That was the plan. * * * LaGene's health was good * * * I never seen anybody that had such a beautiful personality as she had. * * * She was just lovable."

We have approved substantial recovery in several cases involving young children and teenagers. Graham v. City of Ames, 196 Iowa 337, 192 N.W. 299; Raines v. Wilson, 213 Iowa 1251, 239 N.W. 36; Hart v. Hinkley, 215 Iowa 915, 247 N.W. 258; Lenth v. Schug, 226 Iowa 1, 281 N.W. 510; Anderson v. Strack, 236 Iowa 1, 17 N.W.2d 719; Thornbury v. Maley, 242 Iowa 70, 45 N.W.2d 576.

Graham v. City of Ames was decided in 1923. At that early date we sustained a verdict for $10,000, in the case of a young

man eighteen years of age. He was in college and was engaged in delivering newspapers when he came in contact with a live wire of the Ames electric system and lost his life. The evidence tendered to sustain the amount of the verdict was the fact that he was an enterprising young man and had been engaged in delivering and selling newspapers for about four years. He was above the average in business energy and capacity.

In Raines v. Wilson, supra, we affirmed a verdict of $3500 with reference to a little girl six and one-half years old. The evidence presented was that her health was excellent; she had never been under a doctor's care; learned rapidly, and was being reared in a good family. We made the following observation in the case at page 1263 of 213 Iowa: "There can be no fixed rule as to the amount of recovery in cases of this kind. There is nothing in the record to indicate that the verdict is the result of passion and prejudice."

In Hart v. Hinkley, supra, the jury returned a verdict of $15,000. The trial court reduced it to $10,000. We reduced the verdict to $7500. Decedent was a high-school boy seventeen years of age. The decision does not disclose evidence as to characteristics of decedent.

In Lenth v. Schug, supra, the jury returned a verdict of $6000. Decedent was a girl ten years old. As to elements to be taken into consideration (page 11 of 226 Iowa) the trial court instructed: "In determining the amount of damages which it will allow plaintiff, if any, and in determining the expectancy of life of LuNida Lenth, you may take into consideration what the evidence shows as to the health, habits, appearance, education, experience, and earning capacity of LuNida Lenth at the time of her death." The use of the words "earning capacity" was assigned as error in connection with a ten-year-old girl, but we refused to reverse on that ground, it being held without prejudice since there was no evidence concerning the matter. This case was before us nearly twenty years ago and we said: "In view of our prior decisions, we are of the opinion that the verdict should be reduced to $4500."

Anderson v. Strack, supra, (1945) pertains to the death of Barbara Bauman, age six years. The jury returned a verdict of

$9210. The trial court reduced it to $5510. In the case we said at page 8 of 236 Iowa: "Generally speaking, the measure of recovery by the estate of a decedent for damages for his wrongful death is the present worth or value of the estate which decedent would reasonably be expected to have saved or accumulated if he had lived out the natural term of his life." In this case we discussed changing times, increase in earning capacity through the years and decrease in interest rates. We stated in the case: "In 1934 we limited to $4500 the recovery by the estate of an eight-year-old boy for his death. * * * In 1938 and 1939 the same figure was fixed for damage to the estate of a ten-year-old girl from her death. * * * Since the times of these decisions the level of personal earnings has continued to rise, while interest rates have diminished." We affirmed the figure approved by the trial court of $5510.

Our latest case was Thornbury v. Maley, supra, in 1951. Joan Thornbury was a sixteen-year-old high-school girl. Her activities and personal qualities were somewhat similar to those of LaGene, except she had earned some money from tap dancing and taking care of children. The jury returned a verdict of $11,250, which we affirmed. We made some significant statements in the case (page 79 of 242 Iowa) which are pertinent in the case at bar: "Pursuant to the foregoing Code section [section 613.11] the factors to be considered in connection with a claim for damages for the death of a woman are the same as a man. There can be no fixed rule regarding the amount of recovery in the case of a woman of the age of decedent." We quoted with approval from case of Ellis v. Republic Oil Co., 133 Iowa 11, 21, 110 N.W. 20, 24: "*** 'Nor does the fact that the intestate was a girl, instead of a boy, afford any reason for discounting this proposition in these days when the services of women in the school, office, and shop, as well as in the household, find market everywhere at remunerative figures. The court can fix no rigid or inflexible rule or standard by which to assess such damages. They must be reasonable, but what is reasonable is a question for the jury, and the court should not set it aside unless the verdict be so excessive as to shock its sense of justice.' * * * [page 80] A verdict should not be disturbed unless it is so

flagrantly excessive as to raise a presumption that it was the result of passion, prejudice, or undue influence."

 The statement quoted with reference to demand for services of women in every walk of life at remunerative wages is far more effective today than it was many years ago when first made by this court. There is no evidence in this case, nor is there any testimony by any juror in connection with the hearing on motion for new trial, that indicates any passion and prejudice on the part of the jury as to the verdict rendered. It is in accord with our previous decisions, and present-day conditions, and should not be disturbed.

 III. Appellants allege there was misconduct of the jury in its deliberations, and a new trial should be granted. The allegation in the motion for new trial was in substance that the jury attempted to fix a value on the life of decedent rather than arrive at the amount of damage disclosed by the record, and that for such purpose they discussed and considered government life insurance on a soldier. They also allege the jury computed a quotient from the amounts suggested, resulting in the amount of the verdict.

In an attempt to sustain this allegation appellants called three jurors as witnesses in connection with hearing on motion for new trial.

Juror Halbur testified: "We discussed the subject of government life insurance on soldiers. I can't recall it at all, but just a general discussion. We didn't use it as a verdict or anything. * * * We talked about the fact as having some bearing on the question that the government put $10,000 value on the life of a soldier. * * * As far as I know I don't think the jury based its final verdict upon that proposition * * *."

Juror Wiskus was only interrogated on the question of quotient verdict. He testified: "At no time while we were in the jury room did any member of the jury add up various suggested sums of recovery and divide them by the numbers you had suggested. We never set it on that basis at all. * * * There wasn't that kind of computation talked over or discussed in the jury at any time. I heard no discussion about either doing it or about it having been done because he'd [the Judge] already said on the instructions that when you go in there you couldn't

do it. * * * To my knowledge nothing like that was done in the jury room."

Juror Jons testified: "I heard discussion in the jury room of government life insurance. * * * The fact that the government did that was talked about, but I don't believe it was a direct influence. I would not concede it might have been an indirect influence on my part."

This is the only testimony offered by appellants in support of motion for new trial on the basis of misconduct of the jury. The trial court did not deem the evidence of sufficient importance to sustain the motion. We always give weight to the decision of the trial court as to this question. Independent of such weight, we approve the ruling of the court. As to the question of quotient verdict there is no evidence to sustain this allegation. Concerning the question of discussion of government insurance, we have held in many cases that discussions in the jury room somewhat similar to those shown in this case are an attempt to impeach the jury's verdict, and are not a basis for new trial. Normally such discussions inhere in the verdict. State v. Dudley, 147 Iowa 645, 653, 126 N.W. 812, 815; Keller v. Dodds, 224 Iowa 935, 939, 277 N.W. 467, 470; Hoffman v. Jones, 229 Iowa 333, 294 N.W. 588; Nicholson v. City of Des Moines, 246 Iowa 318, 67 N.W.2d 533; Klein v. Swift & Co., 248 Iowa 563, 81 N.W.2d 469.

In State v. Dudley, supra, we stated: "Affidavits of jurors that they have been unduly influenced by their fellows, or of the reasons for assenting to the verdict, or of improper arguments resorted to in the jury room, or that they did not assent to the verdict, or that it was not the result of their deliberate judgment, or they did not understand the instructions of the court as these matters inhere in the verdict, are incompetent, and cannot be received to impeach the jury's findings."

In Keller v. Dodds, supra, we said: "It has long been established that jurors should not be allowed to impeach their own verdict, and it seems to us that to permit a juror to testify by affidavit or otherwise, to the effect that a certain conversation influenced him and caused him to reach a certain verdict, is violative of the rule that jurors should not be allowed to im-

peach their verdict, and that statements that such talk did in fact influence them inheres in the verdict itself."

The judgment is affirmed.—Affirmed.

HAYS, C. J., and OLIVER, BLISS, WENNERSTRUM, GARFIELD, LARSON, and THOMPSON, JJ., concur.